# Harlan Collieries Co. v. Johnson et al.

June 25, 1948.

Sampson & Sampson for appellant.

Golden & Lay for appellees.

OPINION OF THE COURT BY JUDGE KNIGHT—Affirming in part, reversing in part.

This is an appeal from a judgment of the Harlan Circuit Court affirming an award of the Workmen's Compensation Board against appellant in favor of appellee. The Board had previously confirmed the recommendation of the Referee. The award rendered by the Board and sustained by the Circuit Court allowed appellees compensation at the rate of $12 per week beginning April 21, 1943, for a period of 400 consecutive weeks with interest at 6% on all past due installments from date until paid and allowed appellant credit for $1477.-31; the total amount of compensation to be paid, subject to the credit, not to exceed $4800, together with $150 funeral expenses of deceased. In its award, the Board, confirmed by the judgment of the court, refused to allow appellant an additional credit in the sum of $1097.81.

Appellees cross-appeal from so much of said judgment as allows appellant credit for $1477.31 for money and supplies furnished appellees.

### Grounds for Appeal

Appellant bases its plea for reversal on the following grounds: (1) The accident complained of did not arise out of and in the course of decedent's employment; (2) the injury sustained by decedent was not a traumatic injury within the scope of the Compensation Act, KRS 342.001 et seq.; (3) the pre-existing disease, tuberculosis, should have been apportioned with the alleged injury and the percentage of causation of death should have been determined therefrom; (4) the appellant should have been given credit for the additional sum of $1097.81 advanced to decedent. Appellees' cross-appeal is based on the contention that appellant should not have been allowed credit for $1477.31 against the award.

## Facts in the Case

Garnie Johnson was twenty-nine years of age, weighed about 187 pounds at the time of his injury and up to that time was in good health and was able to do his work at the mine, which was that of a helper or hostler after a coal cutting machine. He had been employed by appellant for about nine years. On the morning of April 21, 1943, he had gone to work early, about 4 A. M., in order to do some preliminary work so that the coal cutters would not be delayed when they came on at their regular shift at 7:30 A. M. Before going into the mine it was necessary for decedent and each employee to procure his lamp from the lamp house and leave his check number in place of the lamp so that a record could be kept of the men who were in the mine. The lamp house was adjacent to and under the same roof as the machine shop. They were separated by a partition but connected by a door which opened between them. In the machine shop was usually kept a white granite bucket containing drinking water and a dipper for use of men employed in the shop but frequently used by any miners who happened to be in the shop. In the lamp house was also a white granite bucket filled with a strong acid and used in filling the batteries of the miners' lamps. In this bucket was a ladle or a sort of a dipper used to pour the acid into the lamps. At the entrance to the lamp shop was a sign which said "Keep Out," and it was against the rules of the company for the miners to go into this shop to obtain their own lamps. These were to be handed out to each miner by the man in charge. However, this does not seem to have been an iron clad rule and there is proof in the record that the miners at times went into the shop and obtained their own lamps when the attendant was busy. On the morning in question deceased went into the lamp house to obtain his lamp and mistaking the bucket of acid for a bucket of water, he took a drink of the acid. He was seriously burned about the mouth, throat and stomach and some may have gotten into his lungs in his efforts to get it out of his mouth. He underwent treatment in Harlan, Louisville and in Tennessee, but was never able to work again and died on October 29, 1944, the death certificate listing the cause of his

death as "lung infection brought about as accidental result of drinking strong alkali by mistake."

## I

Under the facts outlined above, did the accident arise out of and in the course of decedent's employment? In support of its contention that it did not, appellant cites and relies on the case of Draper v. Railway Accessories Co., 300 Ky. 597, 189 S. W. 2d 934, 937. The facts in that case are so entirely different from the facts in the case at bar as to have no value in determining the present case, but appellant quotes the following language from that opinion as tending to sustain its contention:

"A reading of many opinions of this court (and others) will demonstrate that an injury occurring while the employee is on the premises does not ipso facto fasten liability on the employer. * * *

"If the accident occurred while the servant was performing the service for which he was employed, the injury arises out of the employment. If the accident occurred within a reasonable time before or after the actual work, and in preparation for departure from the service and the thing done was to the interest of the master or an integral part of the preparation, the injury is held to have been received in the course of employment."

Appellees cite and rely on Codell Construction Co. v. Neal, 258 Ky. 603, 80 S. W. 2d 530, 532. In that case the employee, a night watchman, had built a shack, with an improvised stove in it, which was used by him as a shelter from cold when he was not actually patroling the highway where the machinery he was guarding was located. On a bitter, cold night he was burned to death when this shack caught fire. In holding that his death arose out of and in the course of his employment, this court said:

"It is a firmly established rule that acts necessary to the comfort and convenience of the employee while at work, though strictly personal to himself and not acts of service, are incidental to the service, and injuries sustained in the performance of such acts are deemed

to have arisen out of the employment. In Honnold on Workmen's Compensation, Volume 1, c. 381, it is said:

" 'Acts of ministration by a servant to himself, such as quenching his thirst, relieving his hunger, protecting himself from excessive cold, performance of which while at work are reasonably necessary to his health and comfort, are incidents to his employment and acts of service therein within the Workmen's Compensation Act, though they are only indirectly conducive to the purpose of the employment. Consequently, no break in the employment is caused by the mere fact that the Workman is ministering to his personal comfort or necessities, as by warming himself or seeking shelter, or by leaving his work to relieve nature, or to procure a drink, refreshments, food, or fresh air, or to rest in the shade.' "

The first appeal to come before this court from an award by the Workmen's Compensation Board was in Phil Hollenbach Co. v. Hollenbach, 181 Ky. 262, 204 S. W. 152, 13 A. L. R. 524, decided June 21, 1918. In that case the employee was electrocuted while washing himself in a wash basin preparatory to going home. There was evidence that the electric light cord which caused his death had been connected up in some way with the water faucet by some of the employees as a prank to give a mild shock to fellow employees who attempted to wash. Deceased, upon turning on the water for the purpose of washing, received the electric charge which caused his death. It was held that his accident arose out of and in the course of his employment although at the time he was not engaged in the actual work he was supposed to do. We think that under the authority of these cases, and others that might be cited, the accident which caused the death of deceased arose out of and in the course of his employment. He had reported for work; he was obtaining a lamp necessary for his operations; he was attempting to perform a natural function of quenching his thirst. We agree with the findings of the Board "that such an act was incidental to his employment and arose out of and in the course of his employment."

## II

We do not think there is any merit in appellant's contention that deceased's accident was not a traumatic

injury within the meaning of the Compensation Act. Black's Law Dictionary defines trauma as "a wound, any injury to the body caused by external violence," and traumatic as "caused by or resulting from a wound or external violence." While there was in the instant case no physical force or bodily blow generally associated with the word traumatic, there was direct physical injury resulting from the accident which caused damage to his mouth, throat, stomach and lungs. The tendency of modern decisions is toward a more liberal construction of the word traumatic injury. Thus in the case of Great Atlantic & Pacific Tea Co. v. Sexton, 242 Ky. 266, 46 S. W. 2d 87, 89, the employee became infected with tularaemia while dressing rabbits under order of his employer, the infection entering through a pre-existing abrasion on his finger. Although there was no physical force, it was held to be a traumatic accident compensable within the meaning of the Act. As was said by this court in that case:

"In this case, appellee's injuries may be traced directly to coming into contact with meats laden with tularaemia germs. The time, the place, and the cause of the injury are determinable with reasonable certainty. As immediate results of the contact, symptoms peculiar to the disease manifested themselves. It was not a gradual development arising out of natural dangers incident to the employment, but was sudden, unexpected, and unusual, without any of the distinctive features of an occupational disease."

The case at bar is distinguishable from Jellico Coal Co. v. Adkins, 197 Ky. 684, 247 S. W. 972, cited by appellant, where an employee contracted heart trouble from breathing impure air, and is also distinguishable from Mills v. Columbia Gas Construction Co., 246 Ky. 464, 55 S. W. 2d 394, where the employee contracted typhoid fever from drinking water furnished by the employer, no sudden traumatic accident being involved in these cases. Deceased suffered a painful and serious injury from the sudden accident of drinking the acid and we hold that it was of traumatic origin within the meaning of the statute.

### III

Appellant contends that the pre-existing disease, tu-

berculosis, should have been apportioned with the injury and the percentage of causation of death determined therefrom. While the Board made no specific finding on this phase of the case, it did review the evidence bearing on the question of whether or not there was pre-existing tuberculosis and by not making any apportionment evidently reached the conclusion that the evidence did not justify such apportionment. There was ample evidence in the record to justify such conclusion. All non-medical testimony in the record is to the effect that previous to the accident deceased was a strong, healthy young man, weighing 187 pounds, had never been under care of a doctor and worked every day, and in the language of the opinion of the Board, "he was industrially fit for the job he held for the defendant company." There was conflict in the medical testimony in regard to the tuberculosis. Dr. Stepchuck, company doctor, testified that indications of tuberculosis developed some five or six months after the accident; that he did not know if decedent had tuberculosis before the injury and he had not seen anything to indicate it but that from the advanced state of the disease, as later revealed by x-ray, it was his opinion that deceased had it before the accident. Dr. Townsend, who made the x-ray of decedent on December 13, 1943, testified that at that time he found him suffering from pulmonary tuberculosis; admitted that that disease would develop and progress more rapidly if patient is weakened by lack of ability to eat food. Dr. Mulsand, for the appellees, testified that lung infection caused the death of decedent; that it was his opinion that the lung infection started from the irritation due to the drinking of the strong alkali and that the condition was aggravated by his inability to take proper nourishment. Under this conflicting testimony we think the Board was justified in its refusal to consider tuberculosis as a pre-existing disease and to apportion it with the injury as a causation of death in this case.

## IV

We will consider together the deduction of $1477.31 allowed appellant by the Board as a credit against the award, and complained of by appellee, and the failure to allow a credit of $1097.81, complained of by appellant. The deduction of $1477.31 was allowed by the Board

pursuant to the provisions of KRS 342.145 which allows such deduction with the approval of the Board. Since this approval is within the sound discretion of the Board, the courts should not interfere with that discretion unless the Board acts in a capricious, arbitrary or unreasonable manner, of which there is no showing in this record. The deduction is therefore approved.

The item of $1097.81 was for medical, surgical and hospital treatment as provided in KRS 342.020. The limit with which the employer could be charged at the time of this accident in 1943 was $200, increased by 1946 amendment of the Act to $400. However, we have held that an employer voluntarily paying for medical, surgical and hospital treatment in excess of his statutory liability is not entitled to have excess credited against the compensation in absence of an agreement. Stearns Coal & Lumber Co. v. Vanover et al., 262 Ky. 808, 91 S. W. 2d 518; Blue Grass Mining Company v. Stamper et al., 276 Ky. 643, 103 S. W. 2d 112. Whether or not there was such agreement is a disputed question of fact and on that question of fact, the decision of the Board is final unless made without any evidence of substantial probative value. There was no such evidence. All the evidence is to the contrary. This contrary evidence is all based on the testimony of John McKinley, Secretary-Treasurer of appellant company, which testimony was given after the death of Garnie Johnson. The competency of his testimony under Sec. 606, subd. 2 of the Civil Code of Practice depends on whether he is a mere salaried employee of the appellant company and, as such, its agent or whether he is a stockholder in said company which would disqualify him on the ground of financial interest. Massey's Adm'r v. Pike Consol. Coal Co., Ky., 116 S. W. 276, and cases therein cited. Since the competency of his testimony was not passed on by the Board and since the record before us does not show he is a stockholder, but shows only that he is an agent, his testimony is admissible. Under his testimony the Board could only conclude that there was an agreement between deceased and appellant that the money which was being advanced to him for medical, surgical and hospital bills was being charged against him and that its repayment was expected and required. The Board therefore erred in not allowing so much of this deduction as

exceeded $200.00, the statutory allowance at that time. The award of the Board should therefore be credited in favor of appellant in the sum of $897.81.

For the reasons herein indicated, the judgment of the lower court is affirmed in part and reversed in part.