116 N.J. Super. 348 (1971)
282 A.2d 415
KENNETH J. SHEA, APPELLANT,
v.
BOARD OF TRUSTEES, POLICE & FIREMEN'S RETIREMENT SYSTEM, DIVISION OF PENSIONS, DEPT. OF TREASURY, STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 21, 1971.
Decided October 15, 1971.
Before Judges GOLDMANN, COLLESTER and MINTZ.
*349 Mr. Raymond J. Dietrich argued the cause for appellant (Messrs. Dietrich & Stockman, attorneys).
Miss Prudence H. Bisbee, Deputy Attorney General, argued the cause for respondent (Mr. George F. Kugler, Jr., Attorney General, attorney).
The opinion of the court was delivered by GOLDMANN, P.J.A.D.
Shea, a patrolman in the employ of Hamilton Township since July 1, 1956, applied for an accidental disability retirement pension pursuant to N.J.S.A. 43:16A-7 by reason of an alleged traumatic incident experienced in the early hours of April 17, 1968. The application was rejected by defendant Board of Trustees of the Police and Firemen's Retirement System after review of the application and the supporting information. However, the Board recognized that Shea was totally and permanently disabled for police duty and approved an ordinary disability retirement. Shea's timely appeal was followed by an administrative hearing before Hearing Officer Miller of the Division of Pensions. After considering certain stipulations entered on the record, Shea's testimony, and the depositions of his treating doctor, A.J. Migliori, and the pension system's examining physician, Martin Epstein, the hearing officer filed his report recommending approval of the application for accidental disability retirement. The matter was again reviewed by the Board of Trustees which, by its determination of August 17, 1970, denied the application, with the result that Shea was granted only ordinary disability retirement under N.J.S.A. 43:16A-6. This appeal followed.
N.J.S.A. 43:16A-7, part of the Police and Firemen's Retirement System Act (N.J.S.A. 43:16A-1 et seq.) provides for an accidental disability retirement allowance upon the written application by a member of the retirement system, provided, however, that
*350 (1) * * * the medical board, after a medical examination of such member, shall certify that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him. * * *

* * * * * * * *
(4) Permanent and total disability resulting from a cardiovascular, pulmonary or musculo-skeletal condition which was not a direct result of a traumatic event occurring in the performance of duty shall be deemed an ordinary disability.
This language parallels that contained in N.J.S.A. 43:15A-43, part of the Public Employees' Retirement System Act (N.J.S.A. 43:15A-6 et seq.), with which we dealt in Hillman v. Board of Trustees, Public Employees' Retirement System, 109 N.J. Super. 449 (1970). We there pointed out (at 459) that the use of the words "traumatic event" represented a significant departure from the word "accident" previously found in the act, L. 1954, c. 84, § 43, and that the Legislature, by use of those words and the addition of a paragraph identical to that in N.J.S.A. 43:16A-7(4), quoted above, "clearly expressed an intention to make the granting of an accidental disability pension more difficult."
In Hillman we held (at 460) that important to a determination of the existence of a "traumatic event" were the following three factors  that "(a) the event be identifiable as to time and place, (b) the injury or disability resulted directly from it, and (c) the event was undesigned, unexpected and unusual."
We join in the determination of the Board of Trustees that what happened here did not satisfy the third of these requirements. The facts are fairly set out in that determination. Briefly, Shea sustained an acute myocardial infarction due to arteriosclerotic coronary thrombosis on April 28, 1966, and was treated for that condition at St. Francis Hospital, *351 Trenton, by Dr. Migliori, a cardiologist. The patient was discharged after three weeks and placed on anti-coagulation therapy treatment for some eight months. Dr. Migliori examined him on April 1, 1967 and again on July 21, 1967, when he noted there were no outstanding cardiovascular or respiratory symptoms and directed that Shea go on an annual cardiogram and office visit program thereafter.
Shea returned to work on August 1, 1966 and was assigned light duties at the station house. He resumed his regular duties on February 6, 1968. On April 16, 1968 he reported for work on the 11 P.M. to 7 A.M. shift and went out on patrol duty, with Officer Otter driving. Shea testified that at 3:20 or 3:30 A.M. of April 17 he and his partner were directed by police radio to go to St. Francis Hospital "to check on a man coming in by the Yardville ambulance, a possible heart attack victim, just to see if he was D.O.A. and if there were any other unusual circumstances involved." The officers immediately proceeded to the emergency room at the hospital where they found the victim, who had been dead on arrival from a coronary attack. Shea said that as soon as he saw the body "I started thinking about myself, I got all upset and nervous and apprehensive and so forth," because the man was a little younger than he. He proceeded to obtain information as to the victim's name, age and previous heart condition, by inquiring of the widow, who was upset and somewhat incoherent, and the hospital. Upon completing this investigation Shea phoned in his report and resumed his tour of duty, having been in the hospital for some 20-30 minutes.
Shea further testified that while on patrol some ten minutes after leaving the hospital he broke into a sweat, experienced terrific pains across his chest, and both arms started aching. He asked Officer Otter to drive him back to St. Francis Hospital, stating that he thought he was having a heart attack. He was admitted to the hospital at 4:10 A.M., where he was treated during the following three weeks by Dr. Migliori. The final diagnosis, as in 1966, was acute *352 myocardial infarction due to arteriosclerotic coronary thrombosis.
Officer Otter did not testify at the hearing. The official police department day sheet for April 17, 1968 shows that the call went out to Officers Shea and Otter on patrol at 2:50 A.M.  not 3:20 or 3:30, as Shea testified. The next entry, recorded at 4:02 A.M., states that Shea was admitted to St. Francis Hospital with a possible heart attack. (We note, in passing, that in his sworn application for retirement Shea stated that the detail began at 2:50 and not 3:20 A.M.).
There was nothing "unexpected" about what happened at St. Francis Hospital in the early hours of April 17. Shea testified that on the average he would annually investigate 50 or 60 emergency admissions at hospitals in the Trenton area. Of these, 10 to 20 percent would be coronary victims, and some would be dead on arrival. In short, the regular course of police duty called upon not infrequent investigations of coronary cases. Accordingly, the assignment to which Shea responded on April 17, 1968 was neither "unexpected" nor "unusual."
Whether the disability suffered by the officer resulted "directly" from what he experienced at the hospital is a question that does not require resolution here.
Finding no unexpected or unusual event that would qualify as "traumatic," the Board's determination is affirmed.