JOSEPH J. CATTANI, APPELLANT-RESPONDENT, v. BOARD
OF TRUSTEES, POLICE AND FIREMEN'S RETIREMENT
SYSTEM, RESPONDENT-APPELLANT.

Argued November 18, 1975—Decided March 24, 1976.

*Ms. Erminie L. Conley,* Deputy Attorney General, argued the cause for respondent-appellant (*Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. William F. Hyland,* Attorney General of New Jersey, attorney).

*Mr. Ira C. Miller* argued the cause for appellant-respondent (*Messrs. Pellettieri and Rabstein,* attorneys).

The opinion of the Court was delivered by

SULLIVAN, J. Joseph J. Cattani, claimant herein, is a retired fireman who is totally and permanently disabled from performing firefighting duties. His application for accidental disability retirement under *N. J. S. A.* 43:16A–7 was denied by the Board of Trustees, Police and Firemen's Retirement System on the ground that his disability was unrelated to a traumatic event occurring in the performance of his duties. Cattani appealed and, following an administrative hearing, the Board of Trustees affirmed its denial of the application, noting that Cattani's ordinary disability retirement, previously granted, "will of course continue."[1]

Cattani appealed to the Appellate Division which, with one judge dissenting, reversed the Board's decision and ordered that Cattani's application be granted. The Board of Trustees appeals to this Court. *R.* 2:2–1(a)(2). We reverse and reinstate the Board's decision denying the application for accidental disability retirement.

Cattani was employed as a fireman by the City of Trenton and, on the date in question, was attached to Engine Company No. 7 which consisted of a "pumper" normally manned by five men. On June 19, 1971 the Company responded to a two-alarm fire. It had only three firemen in its crew at the time, as one man was on vacation and, after the men had reported in, a second was temporarily assigned to another

---

[1]Accidental disability retirement benefits are much more substantial than the ordinary disability retirement benefits payable under *N. J. S. A.* 43:16A–6.

company as acting captain. Manpower shortage was not unusual in the fire department, particularly during the summer period when vacations were being taken. This undermanning of fire companies, however, required those on duty to perform additional firefighting work.

At the scene of the fire, Cattani, assisted by the company captain removed five lengths of hose, each of which weighed about 75 pounds, from the engine. Cattani then dragged the hose into place and played water on the fire. The company captain assisted in this latter operation for a short while. In order to get at the fire, Cattani had to carry a section of hose up to the roof of an adjoining building where he continued to play water on the fire. He was also required to rip open the front of the building to uncover the burning areas. He then returned to the ground and resumed his fire hose activity there. During this period he felt nauseous and dizzy and had to be administered oxygen before returning to his duties.

When Cattani returned to the firehouse some six and one-half hours later, he became temporarily unable to move his arms and legs. He was taken to the hospital, examined by a doctor and released, he having regained the use of his arms and legs in the interim.

Some 10 days after the fire, Cattani began to have recurring episodes of paralysis of his arms and legs. Finally, on September 9, 1971 he was admitted to the University of Pennsylvania Medical Center. He remained there for about one month and was discharged with a diagnosis of basilar artery occlusion secondary to a preexisting condition of atherosclerosis and type IV hyperlipidemia. Basilar artery occlusion is an obstruction of one of the major blood vessels leading to the brain, a slow, chronic, progressive type of disorder. Hyperlipidemia is an increased amount of lipids, fats in the blood stream, and causes hardening of the arteries. Since his discharge, Cattani has remained under periodic medical supervision and takes an anticoagulant daily.

In November 1971, Cattani, on his doctor's advice, returned to light duty in the fire department. On August 4, 1972 the fire department, on behalf of Cattani, filed an application for ordinary disability retirement and, on September 1, 1972, he was placed on involuntary retirement. His application for accidental disability retirement followed.[2]

The statute involved, N. J. S. A. 43:16A–7, in paragraph (1) provides that a member of the retirement system in service

"* * * may be retired * * * on an accidental disability retirement allowance; provided that the medical board, after a medical examination of such member, shall certify that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties * * *."

Paragraph (4) of the same section states:

"Permanent and total disability resulting from a cardiovascular, pulmonary or musculo-skeletal condition which was not a direct result of a traumatic event occurring in the performance of duty shall be deemed an ordinary disability."

The medical proofs submitted at the hearing described Cattani's condition, its symptoms and its severity. Dr. Leavey, the medical doctor for the Board of Trustees, expressed the opinion that Cattani's underlying disease could have been aggravated and rendered symptomatic by the added strain and effort of the events of June 19, 1971, but that it was not caused by them. Dr. Rowen, Cattani's medical expert, agreed with the diagnosis of Cattani's preexisting condition. He said that the stress and strain of Cattani's activities on June 19 probably increased the clotting mechanism in his blood and thus brought about the final closing of the

---

[2] Cattani also had filed separate proceedings for Workmen's Compensation benefits. On February 2, 1973 he was awarded 35% of total permanent disability.

basilar artery. However, he admitted that the prognosis for persons suffering from a condition similar to Cattani's was poor, and that such a person could suffer an episode, such as Cattani did, at rest without experiencing strain.

The hearing officer, whose report was adopted by the Board of Trustees, found that Cattani was totally and permanently disabled from performing firemanic duties but that his disability was not "a direct result" of his firefighting activities on June 19; rather, he found that Cattani was disabled by reason of basilar arterial occlusion, atherosclerosis and hyperlipidemia. He also found that Cattani's firefighting activitives on June 19 did not constitute a "traumatic event" within the meaning of the statute.

In reversing this ruling, the Appellate Division held that the work effort of June 19 was a traumatic event since it was both unusual and excessive, and that the disabling condition (acute thrombosis of the basilar artery) was the direct result of that unusual and excessive work effort.

The development of the present statutory provisions for accidental disability retirement, common to many of our public employee pension statutes, has been discussed in *Russo v. Teachers' Pension and Annuity Fund,* 62 *N. J.* 142 (1973); *Shea v. Board of Trustees,* 116 *N. J. Super.* 348 (App. Div. 1971); *Hillman v. Bd. Trustees, Public Employees' Retirement Syst.,* 109 *N. J. Super.* 449 (App. Div. 1970); *Titman v. Bd. Trustees Teachers' Pens. & An. Fund,* 107 *N. J. Super.* 244 (App. Div. 1969).

Prior to 1964 the pension act in question provided for accidental disability retirement upon certification by the medical board that

"* * * the natural and proximate cause of such disability was an accident met in the actual performance of duty * * *." *L. 1959, c.* 158, pp. 628–629, § 1.

In construing this provision a number of cases applied workmen's compensation concepts to the terms "accident" and "natural and proximate cause." Particularly with re-

gard to a person suffering from a preexisting progressive disease, who became disabled, it was held that the require-. ment of causation was satisfied by showing that the actual work effort, whether or not unusual, materially contributed to the precipitation, aggravation or acceleration of the underlying disease. *Fattore v. Police and Firemen's Retirement System of New Jersey,* 80 *N. J. Super.* 541 (App. Div. 1963).

■ This liberal application of the statute brought a legislative response. In 1964 *N. J. S. A.* 43 :16A–7 was amended to provide that accidental disability retirement would only be granted if the medical board certified that:

"(1) * * * .the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties * * *."

At the same time there was added to the same section the provision that

"(4) permanent and total disability resulting from a cardiovascular, pulmonary or musculo-skeletal condition which was not a direct result of a traumatic event occurring in the performance of duty shall be deemed an ordinary disability."

The legislative purpose was clear. These statutory changes were intended to make the granting of an accidental disability pension more difficult. We noted in *Russo, supra,* 62 *N. J.* at 151, quoting from *Titman, supra,* that the words "traumatic event" were a significant departure from the term "accident" previously used, plainly indicating that the Legislature did not intend that the workmen's compensation concept of "accident" was to be applied to an accidental disability pension statute.

In *Hillman, supra,* 109 *N. J. Super.* at 460, a similar amendment to the Public Employee's Retirement System was held to reject the concept that an "accident" can be found in the impact of ordinary work effort upon a preexisting progressive disease.

*Hillman* sought to give some definition to the new statutory term by stating that, in determining whether there truly was a traumatic event, it was important that (a) the event be identifiable as to time and place, (b) the injury or disability resulted directly from it, and (c) the event was undesigned, unexpected and unusual. By way of *dicta* it also suggested that a traumatic event could be found where unusual or excessive work effort aggravated or accelerated a preexisting disease. 109 *N. J. Super.* at 460–461.

We consider the case at hand. Here Cattani sought to bring his situation within the *Hillman* definition of traumatic event. His contention, sustained by the Appellate Division, was that the additional firefighting work which he was required to perform on June 19 was both unusual and excessive and constituted a traumatic event since it aggravated and accelerated his preexisting underlying disease and directly resulted in his disability.

The *Hillman* test of traumatic event has been applied in other cases. *Conklin v. Bd. of Trustees Police & Fire. Ret. Syst.,* 135 *N. J. Super.* 131 (App. Div. 1975) ; *Shea v. Board of Trustees, supra.* However, this Court has not previously considered the correctness of such definition.

We conclude that the third prong of the *Hillman* test is too broad and frustrates the restriction which the Legislature intended to place on the granting of an accidental disability pension when it substituted the expression "traumatic event" for the word "accident."

We have already noted that the statutory change clearly indicated that the Legislative purpose was to make the granting of an accidental disability pension more difficult. The present provision that it must be shown that the person "is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties" means much more than disability resulting from the aggravation or acceleration of a preexisting disease even though unusual or excessive work effort is involved.

It is important to appreciate the distinction between the term "traumatic event" used in the statute and the phrase "traumatic injury" mentioned in many workmen's compensation cases and statutes in other jurisdictions. From a medical point of view, every injury is traumatic in its effect since it offends against the integrity of the body. This is the context in which these cases and statutes use the term, subject to work connection being shown. Here, though, the statute uses "traumatic" to describe the event which results in a disabling injury, rather than the injury itself.

 Trauma has been defined as "a wound; any injury to the body caused by external violence." *Black's Law Dictionary*, (4 Ed. 1951); see also, *Schmidt's Attorneys' Dictionary of Medicine* (1975). The phrase "traumatic event" would ordinarily involve a mishap or accident involving the application of some kind of external force to the body or the violent exposure of the body to some external force. See 42A *Words and Phrases, Trauma; Traumatic,* p. 3 (4 Ed. 1951).

We recognize that the foregoing definition may not be all-inclusive and that a traumatic event may possibly be found in some situations which do not literally fall within the external force or violence concept but still might be regarded as having traumatic origin. It is clear that this is not such a case. Where, as here, the disability is the end result of a preexisting cardiovascular condition, work effort alone whether unusual or excessive, cannot be considered a traumatic event, even though it may have aggravated or accelerated the preexisting disease. However, a basis for an accidental disability pension would exist if it were shown that the disability directly resulted from the combined effect of a traumatic event and a preexisting disease.

Since Cattani's disability does not stem from an injury or wound produced by external force or violence, he has not satisfied the requirement of a traumatic event and his application for an accidental disability pension under *N. J. S. A.* 43:16A-7 was properly denied. It is, therefore, un-

necessary to consider whether his disability was "a direct result" of the alleged traumatic event. As heretofore noted, he is receiving ordinary disability retirement benefits.

The judgment of the Appellate Division is reversed and the decision of the Board of Trustees is hereby reinstated.

PASHMAN, J. (dissenting). The majority today reverses a determination by the Appellate Division and denies a claimant's application for an accidental disability retirement allowance under *N. J. S. A.* 43:16A-7.

While my Brethren are apparently satisfied that justice has been done, I remain disturbed that they have unnecessarily deprived Joseph J. Cattani of benefits, which within the factual context of this case, he so richly deserves.

The majority bases its decision on a narrow construction of the governing statutory provision which provides for accident retirement benefits upon proof that a "member is permanently and totally disabled as a *direct result of a traumatic event* occurring during and as a result of the performance of his regular or assigned duties . . . ." [Emphasis supplied]. After engaging in a coldly-analytical review of claimant's inherently hazardous occupation (that of a fireman), his activities at the time of his injury, his physical condition prior to the injury, and the nature of the injury which he sustained, the majority concludes that claimant's proofs fail to bring him within the statutory ambit of *N. J. S. A.* 43:16A-7. This is a result in which I cannot join. I would affirm the Appellate Division and permit the claimant to collect an accidental disability retirement allowance.

Joseph J. Cattani, the claimant-respondent herein was formerly employed by the Trenton Fire Department as a fireman. Now 35 years old, Cattani began serving in that Department in 1966 at which time he enrolled in the Police and Firemen's Retirement System, making him technically eligible for the accidental disability benefits which are at issue in the instant case.

On the night of June 19, 1971, Cattani's fire unit, Engine Company No. 7, responded to a fire alarm at the Crest Paper Co. in Trenton. Cattani's fire company which consisted of a "pumper" fire engine normally employed a full complement of five men, the number necessary to operate the apparatus. On this particular occasion, however, Engine Company No. 7 had had its strength depleted by the summer vacation of one of its members and the assignment of another member to a different company. Due to summer vacation schedules and illnesses, the short-handed condition of Cattani's fire company was not unusual for the summer months. In fact, other companies at that time were experiencing similar problems. However, while Cattani could remember responding to fires with only four men in his company, the fire on June 19, 1971 was the first instance in which he and his company were dispatched with as few as three men. Normally in such situations, the remaining firemen would assume the duties of their absent comrades with assistance from other fire fighting units responding to the same blaze. On the night in question, however, the depleted strength of the other companies and another fire at a different location made the manpower situation at the Crest Paper Co. fire even more acute then it otherwise might have been.

Arriving at the scene of the fire, Cattani, with the assistance of the Captain of his unit, unloaded five sections of two and one-half inch hose from the back of the pumper. Cattani then singlehandedly dragged the hose line weighing 400 pounds towards the burning building, a function normally performed by three men. Cattani in his five years of service had never carried this heavy load by himself. With some initial assistance from the Captain, Cattani then positioned the hose so that it could be trained upon the fire. After readying it, he directed a stream of water at the fire by himself, a task which, because of the weight of the hose and the force of the water; normally requires the efforts of four men.

Shortly afterwards, Cattani was ordered to mount an adjoining building in order to play water on the burning structure. To do this he had to carry a 50 foot section of hose, weighing approximately 100 pounds, up a ladder to the roof. While ordinarily this function is assigned to the members of a ladder company, on this night the ladder company which arrived at the fire, like Cattani's own unit, was undermanned. Athough Cattani had performed this task in the past, he had never before done so alone.

Cattani thereafter performed "ventilation work" at the front of the burning building. This job entailed the removal of plywood and corrugated steel panels from the burning structure. This too was a function which Cattani had rarely performed before this occasion because it usually was accomplished by members of a ladder company. Not only was Cattani assigned to this task, but as with the other tasks, he was ordered to undertake the "ventilation work" by himself; ordinarily, it requires at least two men to perform.

Upon completion of this work, Cattani returned to the hose which he had originally positioned when his company arrived at the fire. Resuming his duties there, he singlehandedly manned the fire hose for the next two and one-half hours. A feeling of nausea and the inability to breathe caused Cattani to briefly leave his duties to receive medical attention. Although he subsequently returned to his position, on two other occasions during the evening he had to report to the attending ambulance for treatment. Following each medical visit, Cattani resumed his fire-fighting activities. After the fire had been extinguished, Cattani assisted in rolling the hoses for storage on the fire truck, a task which had Engine Company No. 7 been fully manned he would not have had to perform.

Upon returning to the fire station, Cattani was unable to move his arms or legs, or speak, and was rushed to a nearby hospital. In the succeeding two weeks, he experienced several similar attacks of paralysis warranting medical attention.

Subsequent medical testing revealed that Cattani suffered from a basilar artery occlusion secondary to arteriosclerosis and hyperlipidemia. These conditions, which pose an imminent danger of blood-clottng in and obstruction of blood vessels in the brain, necessitated regular medical examination and treatment, and a greatly reduced activity schedule. Accordingly, when he was permitted to return to work in November 1971, Cattani was restricted to serving as driver for the Trenton Fire Chief.

On September 6, 1972, Cattani filed an application for an accidental disability retirement allowance pursuant to *N. J. S. A.* 43:16A-7. Although this application was denied by the Board of Trustees of the Police and Firemen's Retirement System, claimant was granted an ordinary disability pension, *N. J. A. C.* 17:4-6.7(a)(3), in a letter dated January 16, 1973. Cattani appealed this decision, and in accordance with his request, a hearing was held on July 20, 1973, during which testimony was taken from two physicians as well as from Cattani himself. The two physicians, serving as medical experts for the respective sides, concurred as to the underlying nature of the condition from which claimant suffered. They disagreed, however, as to the causative effect which the events of June 19, 1971 had on Cattani's obviously worsened condition. The expert for the Board of Trustees suggested that Cattani's exertions on the night in question had merely "aggravated" a preexisting condition. Expert for the claimant, however, attributed a greater responsibility to the additional work which Cattani had performed at the Crest Paper fire, and, in fact, found that such work had produced the arterial occlusion which necessitated reduced activity by the claimant.

The hearing officer in his report denied accidental disability benefits because he found that the activities in which Cattani had engaged on June 19, 1971 did not constitute a "traumatic event" as that term is employed in *N. J. S. A.* 43:16A-7. In conjunction with this finding, the hearing

officer also reported that claimant had failed to demonstrate that his disability was a "direct result" of these activities. The officer did, however, state that in his present condition, claimant was totally and permanently disabled. On December 20, 1973, Cattani filed exceptions to this report and on March 5, 1974, the Board of Trustees affirmed both their initial decision and the findings of the hearing officer.

Cattani appealed the decision of the Board of Trustees, and the Appellate Division reversed the determination of that body. The court's *per curiam* opinion stated:

> During a substantial portion of the lengthy period in which the claimant was on duty at the fire, he was engaged singly in performing tasks which, because of their strenuous nature, under normal operating procedures customarily are performed by three men for the most part. The claimant's disabling condition (acute thrombosis of the basilar artery) was the direct result of that unusual and excessive work effort.

This opinion elicited a dissent and defendant appealed as of right pursuant to *R.* 2:2–1(a)(2). Today, this Court reverses the Appellate Division decision.

This reversal by the majority is premised largely upon its interpretation of *N. J. S. A.* 43:16A–7 and, in particular, that language which was changed by a 1964 amendment. Prior to 1964, a member of the pension system was entitled to disability benefits upon proof "that the natural and proximate cause of such disability was an accident met in the actual performance of duty." The 1964 amendment was intended to impose a more stringent standard for the requisite medical certification. *Russo v. Teachers' Pension and Annuity Fund,* 62 *N. J.* 142, 151 (1973); *Hillman v. Board of Trustees, Public Employees' Retirement System,* 109 *N. J. Super.* 449, 460 (App. Div. 1970). Consequently, a member's eligibility for benefits now required proof that he was "permanently and totally disabled as a *direct result of a traumatic event* occurring during and as a result of the performance of his regular or assigned duties." (Emphasis supplied).

In construing this provision, the majority correctly, I believe, repudiates the third prong of the definition of "trauma" which the Appellate Division enunciated in *Hillman v. Board of Trustees, supra*. The third prong, which considers whether an event from which disability resulted was "undesigned, unexpected and unusual," accords misplaced significance to the nature or quality of the event from which the disability resulted as opposed to the type of injury which occurred to, and its effect on, the individual pension member. It makes little sense to me to condition entitlement to pension benefits upon amorphous distinctions concerning particular events, when the measurement of trauma is peculiarly related to the type of disability which an individual suffers as a result of his response or reaction to the event. Furthermore, the evanescent quality of words such as "unexpected" and "unusual" in the *Hillman* definition make their application not only difficult, but potentially arbitrary. Finally, in the existing economic climate in which our state and local agencies operate, the *Hillman* definition would effectively deprive firemen and police of disability benefits where injuries are incurred as a result of what may be characterized as "expected" cutbacks and the attendant understaffing of their vital services.

Nonetheless, while agreeing with the majority's modification of the *Hillman* criteria, I must distinguish my position from its all-too-narrow interpretation of "traumatic event." Although a "traumatic event" may, as the majority observes, envision a mishap or accident which involves "the application of some kind of external force to the body or the violent exposure of the body to some external force" ante at 586, it cannot properly be confined to such a construction.[1] To

---

[1]Even the majority acknowledges this proposition:

We recognize that the foregoing definition may not be all-inclusive and that a traumatic event may possibly be found in some situations which do not literally fall within the external force or violence concept but still might be regarded as having traumatic origin. Ante at 586.

do so, would seriously overlook the internal bodily complications which may be the product of such an external force. Pursuant to both the commonsense and medical usages of the term "traumatic," overexertion by an individual as well as the application of external forces upon that individual may be the cause of debilitating trauma. For this reason, courts have consistently eschewed an interpretation which would foreclose consideration of the overall effect of a traumatic event or injury on a disabled individual. The court in *Harlan Collieries Co. v. Johnson*, 308 *Ky.* 89, 212 *S. W.* 2d 540 (Ct. App. 1948), for example, lucidly expressed this point in awarding compensation to the family of a miner who had accidently consumed acid:

We do not think there is any merit in appellant's contention that deceased's accident was not a traumatic injury within the meaning of the Compensation Act. Black's Law Dictionary defines trauma as "a wound, any injury to the body caused by external violence," and traumatic as "caused by or resulting from a wound or external violence." While there was in the instant case no physical force or bodily blow generally associated with the word traumatic, there was direct physical injury resulting from the accident which caused damage to his mouth, throat, stomach and lungs. The tendency of modern decisions is toward a more liberal construction of the word traumatic injury. [212 *S. W.* 2d at 543].

*See also Great Atlantic & Pacific Tea Co. v. Sexton,* 242 *Ky.* 266, 46 *S. W.* 2d 87 (Ct. App. 1932) (employee's pre-existing abrasion became infected with tularemia from handling rabbits under orders from employer; *held* to be "traumatic accident").

In several other cases whose factual patterns approximate that of the instant case, courts of other jurisdictions have found traumatic injuries to have occurred. In *Metcalf v. Dep't of Labor & Industries,* 168 *Wash.* 305, 11 *P.* 2d 821 (Sup. Ct. 1932), for instance, the employee suffered a cerebral hemorrhage while sawing a log. Because of the unusual manner in which he was forced to accomplish the task and the undue haste with which he worked (the log

blocked a road through which traffic was attempting to pass), the employee overexerted himself. Medical examinations subsequently revealed hardened arteries which had burst with the strain of the employee's efforts. In spite of this pre-existing condition, the employee's survivors were held to be entitled to statutory benefits which had accrued when their predecessor suffered a "traumatic injury."

In *Calland v. Industrial Comm'n,* 55 *Ohio App.* 306, 9 *N. E.* 2d 736 (Ct. App. 1937), the deceased husband of appellant was held to have sustained a traumatic injury within the meaning of the relevant statutory provision. The husband, who was described as "a robust man, in apparent good health," served as a shipping clerk for a furniture company. In this capacity, he had assisted in the loading of light freight usually with the aid of mechanical devices which, as the court described, were "designed to eliminate lifting and the sudden exertion of heavy direct lifts." On the particular day in question, Calland had loaded one of his employer's trucks and proceeded to drive it to its nearby destination. Upon his arrival, Calland assisted another man in the unloading process. In addition to the light items which were delivered, there were two heavier pieces of furniture, a chiffonier and a dresser. Both of these had to be carried and maneuvered up a narrow and winding flight of stairs. This difficult task "required a sustained and prolonged exertion on the part of Calland, to which he was not accustomed." Not only did the unusual exertion necessitate the use of different and unused muscles on his part, but it required his performing tasks for which he had little dexterity or experience. The bodily strain to which he was subjected caused the rupture of a blood vessel in his brain, and ultimately, his death. In reversing a lower court determination, the appellate court found Calland's death to be within the statutory ambit:

Calland sustained a traumatic injury, to wit, a ruptured blood vessel in the brain. Trauma, in the form of sustained pressure, burst

that blood vessel. There is not any evidence in the entire record from which reasonable minds might arrive at a conclusion that the ruptured blood vessel was proximately caused or produced by factors inherent in the nature of Calland's usual employment. Not even the most strained interpretation of the evidence could give rise to an inference that anything which Calland did in the performance of his usual duties had so much as the remotest bearing on the accidental injury that he suffered on November 23, 1933. On the contrary, the record does establish the fact that the rupture of the blood vessel was produced by an over-exertion which was distinctive in character and definite as to time and place of occurrence. [9 *N. E.* 2d at 738].

In the instant case, there is ample evidence with which to reach a comparable result despite the majority's judgment to the contrary. The claimant engaged in several activities for which had little or no prior experience. In several of these tasks, he singlehandedly performed work which normally required the efforts of several men, and in which it may be inferred, he overexerted himself. As a result of this extended and sustained activity, Cattani, like the more unfortunate Calland, suffered an internal injury of obvious severity. Hence, the conclusion that this injury was a product of a traumatic occurrence should follow as logically in this case as it did in *Calland.*

In reaching this conclusion, I categorically reject the majority's fanciful distinction between the phrase "traumatic event" and "traumatic injury." Trauma is a medical term of art which has reference to the effect which an injury has on an individual. It is, therefore, inaccurate, if not meaningless, to associate the term with the description of an event. In this regard, the statutory language, "traumatic event," may be no more than an unfortunate way of referring to an event which resulted in a traumatic injury. To argue otherwise is to vest an incident with amorphous qualities through the use of a term — trauma — whose meaning and scope are inherently delimited by medical dimensions.

After completing its labyrinthic construction of "traumatic event," the majority finds it unnecessary to consider

whether Cattani's disability was a "direct result" of said event. However, by concluding that this disability did in fact stem from an external force with internal complications and therefore did fall within the statutory ambit of "traumatic event," I must now necessarily discuss the direct causal relationship between said disability and the event. My determination in this regard relies primarily on the testimony of the two medical experts. The expert for the Board of Trustees tended to negate the causal relationship between claimant's activities and his disability by suggesting that Cattani's basilar artery occlusion and hyperlipidemia existed prior to his initial hospitalization. If we were to accept his testimony alone we would be forced to overlook the conflicting testimony presented by claimant's expert witness. That clearly indicated the existing causal relationship between the firefighting activities and the disability sustained. Furthermore, we also would have to overlook the total absence of definitive symptoms which would even suggest such a condition in Cattani prior to his activities of June 19, 1971. The mere fact that claimant ultimately might have suffered from this condition in the distant future cannot detract from its sudden manifestation after his firefighting activities. If nothing else, the fact that he has not been able to engage in such activities since the night of the Crest Paper fire because of the disabling arteriosclerotic condition may strongly suggest the relationship which the defendant would have us deny. Certainly, an unwillingness to recognize a previously unmanifested condition as the direct result of a traumatic event because of its preexisting potentiality to become symptomatic is as logically fallacious as designating life to be a terminal illness because death may be inevitable.

While acknowledging that the 1964 amendments to *N. J. S. A.* 43:16A-7 were intended to restrict the availability of accidental disability allowances, I cannot believe that these changes were intended to preclude claimants such as Cattani from obtaining benefits. In addition to the reference to

"traumatic event," these amendments added a provision which is relevant to the instant case:

Permanent and total disability resulting from a cardiovascular, pulmonary or musculo-skeletal condition which was not a direct result of a traumatic event occurring in the performance of duty shall be deemed an ordinary disability.

This amendment does not, as the majority itself admits, *ante* at 586, preclude claimants with these conditions from receiving the higher accidental disability benefits. Rather, the provision only conditions the receipt of such benefits upon proof that the disability caused by one of these underlying conditions was the direct result of a traumatic event.

Application of this principle is perhaps best illustrated in *Hillman v. Board of Trustees, supra.* The claimant in that case was a maintenance man, whose "health was apparently good." As an employee of the State Department of Transportation, he was covered by the Public Employees' Retirement System. On the day in question, Hillman had been ordered by his superior to report to work in order to assist in the Department's efforts with regard to a snow emergency. Upon arrival, he was assigned to operate a piece of snow-removal machinery with which he had little previous experience. During his operation of the machine, one of its wheels dropped into a hole. In his efforts to regain control of the steering mechanism which had been wrenched from his hand, Hillman suffered a severe heart attack which precluded his returning to his official duties. Like the claimant in the instant case, Hillman filed an application for benefits under a statute which had been amended by the addition of a provision identical to the 1964 amendment to *N. J. S. A.* 43:16A-7. In granting the claimant benefits, the court there stated:

. . . The event — namely, the sudden wrenching of the steering wheel out of petitioner's hands and his struggle to regain control of the front-end loader — aggravated Hillman's *preexisting arteriosclerotic heart disease*, causing it to become permanent, chronic and

totally disabling. Finally, the event was clearly undesigned, unexpected and unusual.

There can be no question that petitioner's present disability is a "direct result" of the traumatic event. As this court said in *Titman*, "the word 'direct' connotes relative freedom from remoteness, whether in terms of time, intervention of other attributive causes or the like, or a combination of such factors." 107 *N. J. Super.* at 247. The heart attack made chronic what had previously been an asymptomatic condition. Dr. Schulz testified that were it not for the attack, Hillman, who had theretofore been relatively healthy and accustomed to heavy work, could have lived and worked normally and indefinitely. [109 *N. J. Super.* at 461; emphasis supplied].

Courts in other jurisdictions which have construed statutes requiring the certification of a "traumatic" disability, have similarly permitted an employee's recovery despite preexisting conditions. *Metcalf v. Dep't of Labor & Industries, supra; Griggs v. Lumbermen's Mut. Cas. Co.*, 61 *Ga. App.* 448, 6 *S. E.* 2d 180 (Ct. App. 1939).

The majority today relies on a very narrow interpretation of the governing statute to deny the deserving claims of a fireman whose selfless efforts are worthy of emulation. While I recognize the restrictive policy which underlies *N. J. S. A.* 43:16A–7, I firmly believe that the majority has gone far beyond the Legislature's intent in imposing such a restrictive construction which will frustrate the award of benefits which I regard as warranted.

Therefore, I must affirm the result reached by the Appellate Division and dissent from the majority's disposition of this matter.

*For reversal*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN and CLIFFORD and Judge CONFORD—5.

*For affirmance*—Justice PASHMAN—1.