157 N.J. Super. 324 (1978)
384 A.2d 1104
IN THE MATTER OF CARMEN A. IANNELLI, DECEASED.
Superior Court of New Jersey, Appellate Division.
Argued January 24, 1978.
Decided March 9, 1978.
*326 Before Judges LORA, SEIDMAN and MILMED.
Mr. Joel B. Korin argued the cause for appellant, Jean Iannelli (Messrs. Brown, Connery, Kulp, Wille, Purnell & Greene, attorneys).
Mr. Samuel J. Halpern, Deputy Attorney General, argued the cause for respondent Board of Trustees (Mr. John J. Degnan, Attorney General of New Jersey, attorney; Mr. William F. Hyland, former Attorney General of New Jersey, on the brief; Ms. Erminie L. Conley, Deputy Attorney General, of counsel).
The opinion of the court was delivered by SEIDMAN, J.A.D.
Carmen Iannelli, a 50-year-old firefighter employed by the Camden Fire Department since 1953, died suddenly on June 5, 1975 after participating in the fighting of a fire. His widow filed an application for accidental death pension benefits with the Police and Firemen's Retirement System under N.J.S.A. 43:16A-10. The board of trustees of the system denied her application. She appealed, whereupon an administrative hearing was held, following which the hearing officer recommended that the decision of the board of trustees denying the application be affirmed, essentially upon findings that "[t]he work effort of June 4th and 5th, 1975 involved no injury by external force or violence," and "[d]eath resulted from work effort alone." The board of trustees adopted the recommendation and rejected the claim. This appeal ensued.
The issue is whether decedent's death after prolonged exposure on the night in question to smoke and fumes from burning bales of paper in an open area adjacent to a warehouse *327 resulted from an "accident" within the purview of N.J.S.A. 43:16A-10.[1] In determining this question we apply the judicial guidelines for "traumatic event," the term appearing in accidental disability retirement statutes,[2] which has been equated with the word "accident" in death benefit statutes. Russo v. Teachers' Pension and Annuity Fund, 62 N.J. 142, 152-153 (1973).
On the evening of June 4, 1975, at about 8:30 o'clock, the deceased proceeded with his unit to the scene of the fire in response to a second alarm. After deploying the hoses he and other firemen ascended the roof of the warehouse from which place they directed water onto the burning bales of paper. The acting captain of the unit described the conditions which existed: "there was a lot of smoke," "most of the time it was just black smoke,:" "[t]he wind was blowing against us," "[w]e were eating smoke all the time," "it was very intense."
After about a half-hour, the unit moved to another location, where the wind again blew smoke toward them. They remained in the area for four to five hours, during which the deceased walked around close to the heat and the smoke, directing a hose on the various "perimeter fires."
Upon their return to the firehouse, at about 1:45 A.M., the firemen proceeded to stretch out the hoses in order to *328 wash them down. As the deceased was unrolling a hose he suddenly collapsed. He had not complained that evening about his health or physical condition. He was rushed to a hospital, where he was pronounced dead upon arrival.
An autopsy disclosed the cause of death to be "acute pulmonary congestion and edema due to idiopathic [unknown] cardiomyopathy." The medical examiner reported that "This is a natural cause of death and persons with this type of heart disease[3] are subject to sudden death under a wide variety of circumstances, it appears likely that the vigorous exertion which Mr. Iannelli was subjected in performing his duties on that day played a role in precipitating his death." However, according to the deceased's widow, he had no prior history of heart disease or any other significant medical problem. In addition, a note was produced at the hearing from the deceased's personal physician, who had been treating him since 1971, in which he stated that during that time the deceased "had not once complained of, had any symptoms of, or was treated in any way, shape or form for a cardiac condition."
Appellant's expert was Dr. Dominick D. Davalos, a board-eligible cardiologist who described himself as actively involved in health problems of special occupational groups, including firefighters. His testimony was by deposition. He expressed the opinion, based upon a hypothetical question containing the essential facts and his review of the pertinent documents and records, that "Mr. Ianelli died of heart and lung damage that resulted from exposure to a number of toxic environmental conditions and toxic gases that he was exposed to over a six or seven hour period in fighting the paper fire." He explained that the smoke indicated the *329 presence of carbon dioxide and an insufficient amount of oxygen. He said that paper fires produced cyanide gas. This exposure to heat, carbon monoxide, cyanide gas and lack of oxygen, according to the witness, was responsible for the fatal pulmonary edema, in that the irritation produced by inhalation of the smoke "caused fluid to pour out into the spaces of the lungs." He further stated that when the heart was unable to pump blood from the pulmonary circulation, "fluids backed up." This, he said, was congestive heart failure. The witness noted that decedent was "remarkably free of arteriosclerosis," and that the autopsy revealed a normal precordium and valves, with no indication of high blood pressure. He said it was inconceivable that decedent had suffered from any myocardial damage or pulmonary edema prior to the fire.
The hearing officer here correctly perceived the main issue to be whether the death was the result of a traumatic event, "within the meaning of the statute as interpreted by the various cases." But he resolved that issue adversely to appellant, expressing the view that while the death appeared to have stemmed directly from the work event, "the mishap or inhalation did not involve the application of external force to the body or the violent exposure of the body to some external force." He said that the deceased's usual and expected duty was to fight fires, with smoke inhalation as an attendant danger. It was his concept that injury resulting from ordinary work effort, though unexpected, was not "an extraordinary or unusual consequence in common experience," and "[d]isability or death is not accidental within the meaning of this or similar statutes when all that appears is that the employee was doing his usual work in the usual way." He added that "[i]nhaling smoke is a natural hazard of firemanic duty and as such does not constitute a traumatic event."
We are convinced that the hearing officer was mistaken in his interpretation and application of the relevant principles of law.
*330 Before the several public employee pension statutes, including the one here involved, were amended so as to make the granting of an accidental disability pension more difficult, an applicant needed to show only that the disability resulted from "an accident arising out of and in the course of his employment," a test equated with the principles applicable in workers' compensation cases. Hillman v. Bd. of Trust., Pub. Emp. Ret. Sys., 109 N.J. Super. 449, 459-460 (App. Div. 1970). The amendments, in this instance L. 1964, c. 241, § 4, introduced the requirement that the permanent and total disability be "a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties."[4] The Legislature intended thereby to mandate "something more than an unexpected injury or death to satisfy the requirement of accidental disability or accidental death." Russo v. Teachers' Pension and Annuity Fund, supra, 62 N.J. at 153-154. Thus, injury by "ordinary work effort or strain" to a diseased heart, although "unexpected by the individual afflicted," would not be "an extraordinary or unusual consequence in common experience," and "disability or death in such circumstances is not accidental within the meaning of a pension statute when all that appears is that the employee was doing his usual work in the usual way." Id. at 154. But cf. Skulski v. Nolan, 68 N.J. 179, 207-208 (1975).
Hillman, supra, introduced a three-pronged test in determining "whether there truly was a traumatic event": that (a) the event be identifiable as to time and place, (b) the injury or disability resulted directly from it, and (c) the event was undesigned, unexpected and unusual. 109 N.J. Super. at 460-461. See Shea v. Bd. of Trustees, 116 N.J. Super. 348, 350 (App. Div. 1971). "Direct result" connoted "relative freedom from remoteness, whether in terms of time, *331 intervention of other attributive causes or the like, or a combination of such factors." Hillman, supra, 109 N.J. Super. at 461; Titman v. Bd. of Trustees, Teachers' Pens. & An. Fund, 107 N.J. Super. 244, 247 (App. Div. 1969).
The correctness of the Hillman definition of traumatic event was considered by the Supreme Court in Cattani v. Bd. of Trustees, Police & Firemen's Ret. Sys., 69 N.J. 578 (1976). This case involved an application by a retired fireman, totally and permanently disabled from performing firefighting duties, for accidental disability retirement under N.J.S.A. 43:16A-7. It was denied by the board of trustees of the retirement system of which he was a member on the ground that the fireman's disability was unrelated to a traumatic event occurring in the performance of his duties. On appeal, this court, with one judge dissenting, reversed and ordered the board to grant the application. The Supreme Court reversed and reinstated the board's decision.
The facts in that case were that Cattani's fire company, short two men, responded to a fire. He took part first in removing 75-pound lengths of hose from the engine, and he then dragged the hose into place and played water on the fire, following which he carried a section of hose up to the roof of an adjoining building. After returning to the ground he felt nauseous and dizzy and was administered oxygen. He was taken to a hospital, temporarily unable to move his arms and legs. He was examined there and released. Several days later, when episodes of paralysis recurred, Cattani was again admitted to a hospital. He was discharged about a month later with a diagnosis of basilar artery occlusion (obstruction of a major blood vessel leading to the brain), and type IV hyperlipidemia (an increase in the amount of fats in the blood stream, causing hardening of the arteries).
Medical evidence at the hearing given by a physician for the board of trustees included the opinion that Cattani's underlying, pre-existing disease could have been aggravated and rendered symptomatic by the added strain and effort at the fire, *332 but was not caused by it. Cattani's medical expert agreed as to the preexisting condition. While he thought that the stress and strain probably increased the clotting mechanism in the blood, thus bringing about the final closing of the basilar artery, he conceded that a person could suffer an episode such as Cattani did, without experiencing any strain.
This court held, following Hillman, that the work effort at the fire was a traumatic event since it was both unusual and excessive, and that the disabling condition was the direct result thereof. The Supreme Court found the third prong of the Hillman test (an undesigned, unexpected and unusual event) to be too broad, "frustrat[ing] the restriction which the Legislature intended to place on the granting of an accidental disability pension when it substituted the expression `traumatic event' for the word `accident'." 69 N.J. at 585. It stressed that much more must be shown than "disability resulting from the aggravation or acceleration of a preexisting disease even though unusual or excessive work effort is involved." Id. It said that the word "traumatic" in the statute was intended to describe the event which results in a disabling injury, rather than the injury itself. Id. at 586. The phrase "traumatic event" was defined as ordinarily implicating "a mishap or accident involving the application of some kind of external force to the body of the violent exposure of the body to some external force." Id. The court recognized, however, that "a traumatic event may possibly be found in some situations which do not literally fall within the external force or violence concept but still might be regarded as having traumatic origin." Id.
The specific conclusion reached in Cattani was that where disability is the end result of a preexisting cardiovascular condition, work effort alone, whether unusual or excessive, cannot be considered a traumatic event, even though it may have aggravated or accelerated the preexisting disease. But the court also stated that the result would be different if it were shown that the disability directly resulted from the *333 combined effect of a traumatic event and a preexisting disease. 69 N.J. at 586. Since there was no showing that Cattani's disability came about in any way from any injury caused by external force or violence, the court sustained the denial of the application. Id.
The hearing officer in this case considered the facts in Cattani to be very similar to those in the matter before him. He was correct to the extent that both cases involved firemen whose "usual and expected duty was to fight fires," and that fire "entails smoke and smoke inhalation [which are] dangers attendant upon the performance of firemanic duties." But he failed to take into account the substantial and significant factual differences between the two cases.
Cattani, it is to be noted, concededly suffered from a preexisting, progressive cardiovascular disease, the end result of which in any case would have been some kind of heart episode. Although he was exposed to smoke while fighting the fire prior to his attack, the attack resulted from work effort alone and not wholly, or in combination with a preexisting disease, from any injury caused by external force or violence. But in the case under review no such prior, progressive disease was established, and the issue of aggravation or exacerbation did not arise. Moreover, the proofs here established that the death did not result from work effort alone; it was caused, rather, by the physiological consequences of the deceased's exposure to toxic smoke and fumes.
The precise question which thus confronts us is whether the inhalation of toxic smoke and fumes may constitute a traumatic event as defined in Cattani; that is, whether exposure to such smoke and fumes involves "the application of some kind of external force to the body or the violent exposure of the body to some external force."[5]Cattani did not define further the term "external force," nor did it *334 elaborate on the distinction, if any, between an external force applied to the body and the exposure of the body to an external force. Although the hearing officer in this case concluded that "the mishap or inhalation of gas" did not involve the application of an external force, it is evident that he did so in the belief that a fireman's being exposed to "a natural hazard of firemanic duty," such as inhaling smoke, did not amount to a traumatic event within the intendment of the statute. We come to the opposite conclusion.
The concept of "external," in the context of death or injury, is that the causative means acts from without the body. The term "force" relates to the cause of the injury or death. Thus the connotation of "external force" is an outside force applied to the body, or to which the body is exposed, resulting in injury, whether external or internal, or death. In this regard, one normally envisages a solid, physical object coming into contact with the body, such as a falling beam striking a fireman at the scene of a fire. Cf. Still v. Bd. of Trustees, Pub. Emp. Ret. Syst., 144 N.J. Super. 103 (App. Div. 1976), certif. den. 73 N.J. 46 (1977). But we are unable to discern any sound reason for excluding smoke, fumes and gases from the classification of external forces, particularly since it has been held that where one dies from the inhalation of gas, the death, in such circumstances, results from an external agency, and is violent, in the sense that it was not in the ordinary course of nature. Caffaro v. Metropolitan Life Ins. Co., 14 N.J. Misc. 167, 183 A. 200, 201 (Sup. Ct. 1936), aff'd 117 N.J.L. 146 (E. & A. 1936). See also, Standard Acc. Ins. Co. v. Van Altena, 67 F. 2d 836, 839 (7 Cir.1933). We entertain no doubt whatever that where one is subjected to toxic smoke and fumes resulting in death or total and permanent disablement of the body, such death or disability is directly caused by a traumatic event as defined in Cattani.
We do not agree with the hearing examiner's view that the death in this case was not accidental within the *335 meaning of the pension statute because "all that appears is that the employee was doing his usual work in the usual way." Whether the decedent was engaged in his usual work is immaterial if his death had a traumatic origin. The Cattani court's reference to unusual work effort is pertinent in deciding direct causation when a pre-existing disease is involved. But where, as here, the only question is whether a traumatic event occurred, the relative usualness of the work or the work effort is irrelevant. The only consideration is whether there was a traumatic event and, if there was, whether the death directly resulted therefrom.
We conclude that the deceased's exposure to the toxic smoke, fumes or gases, on the facts here present, satisfied the requirements of a traumatic event. There was a gaseous assault upon his heart and lungs with physical consequences so severe as to cause his death without the impetus of any preexisting condition.
Accordingly, we reverse the final determination of the Board of Trustees of the Police and Firemen's Retirement System denying appellant's application for death pension benefits. The matter is remanded to said Board of Trustees with direction to grant the application. We do not retain jurisdiction.
NOTES
[1] This section provides for accidental death benefits upon proof of death of a member in active service as a result of an accident met in the actual performance of duty at some definite time and place.
[2] Such statutes, e.g., N.J.S.A. 43:16A-7(1), contain provisions for retirement for accidental disability upon a determination that the member "is permanently and totally disabled as the direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties * * *." A qualifying provision, as in subparagraph (4) of this section, is that "[p]ermanent and total disability resulting from a cardiovascular, pulmonary or musculo-skeletal condition which was not a direct result of a traumatic event occurring in the performance of duty shall be deemed an ordinary disability."
[3] The autopsy report disclosed "no occlusions or marked narrowing" of the coronary arteries. Although the aorta displayed "moderately severe atherosclerosis," there was no "definite evidence of an infarct grossly." The pulmonary arteries displayed "minimal atherosclerosis in their approximal branches but no evidence of emboli."
[4] See also N.J.S.A. 43:15A-43 (Public Employment Retirement System), and N.J.S.A. 18A:66-39(c) (Teachers' Pension and Annuity Fund).
[5] It is uncontroverted that the "event," i.e., the fighting of the fire, was identifiable as to time and place, and that the death resulted directly from it.