DANIEL J. KANE, JR., RESPONDENT, v. BOARD OF
TRUSTEES, POLICE AND FIREMEN'S RETIREMENT
SYSTEM, APPELLANT.

DONALD J. CANASTRA, RESPONDENT, v. BOARD OF TRUSTEES,
POLICE AND FIREMEN'S RETIREMENT SYSTEM, APPEL-
LANT, WOODROW W. MINNER, JR., APPELLANT, v. BOARD
OF TRUSTEES, POLICE AND FIREMEN'S RETIREMENT SYS-
TEM, RESPONDENT.

Argued May 6, 1985—Decided October 16, 1985.

*John Joseph Franzini* and *Ellis I. Medoway,* Deputy Attorneys General, argued the cause for appellant and respondent Board of Trustees, etc. (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General; of counsel).

*Jan R. Evans* argued the cause for appellant Woodrow W. Minner, Jr. (*Mr. Evans,* attorney; *Prudence H. Bisbee,* on the briefs).

*Dante J. Romanini* argued the cause for respondent Daniel J. Kane, Jr., (*Kozlov, Seaton & Romanini,* attorneys; *Hersch Kozlov,* of counsel; *James P. Manahan,* on the brief).

*Robert W. Gluck* argued the cause for respondent Donald J. Canastra (*Gluck and Kelso,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

We must determine in these consolidated cases the circumstances under which a police officer may be retired on an accidental disability retirement allowance under the Police and Firemen's Retirement System, *N.J.S.A.* 43:16A–1 to –68. The statute provides for payment of such benefits when an officer is "permanently and totally disabled as a direct result of a traumatic event * * *." *N.J.S.A.* 43:16A–7. For the reasons that follow, we conclude that none of the officers before us is entitled to an accidental disability retirement allowance.

I

A. *Kane v. Board of Trustees, Police and Firemen's Retirement System*

Daniel J. Kane joined the police force in Gloucester Township in 1972 and enrolled in the Police and Firemen's Retirement System in that same year. Kane's police duties included inspecting the homes of residents who were away on vacation to determine whether any burglaries had occurred and to ensure generally that the homes were secure. These "vacation checks" were performed once every 24 hours at the request of the vacationing homeowner.

On November 23, 1980, Kane reported to work and, in uniform, began a one-man patrol. Part of his assigned duties for that day was to perform a vacation check on a home within his patrol area. Kane arrived at the house at approximately 7:30

a.m. and cleared the departure from his patrol car with the radio-dispatcher at police headquarters.

Kane walked around the house, checking the doors and windows, until he reached the garage area. There was a raised lip of concrete, approximately three inches in height, that ran around the front of the door to the second garage. This second garage was a later addition—hence, the lack of an even match in the concrete.

When the police officer stepped on this uneven piece of concrete, he felt his left ankle give way. In his words, "[a]s I stepped and watched the window in the garage * * *, I stepped on this concrete and felt my ankle go. In an attempt to save myself from falling, I shifted my weight at that point * * * [and] I knew I did something to my ankle and my knee." Basically, to save himself from falling, Kane shifted his body weight from his ankle to his knee, but at no time did he either fall to the ground or come into contact with the door.

Feeling "a lot of pain" in the ankle and knee, Kane limped back to the patrol car to use the radio to notify the sergeant about the mishap. The sergeant instructed Kane to undergo an examination in the Emergency Room of West Jersey Hospital, which he did that same morning. The record is unclear as to the precise condition from which Kane suffered, but two years after the incident he still wore an orthopedic brace, never having returned to active duty.

Kane timely filed for an accidental disability retirement allowance on March 16, 1982. The Board of Trustees of the Police and Firemen's Retirement System (Board) denied the officer's application on the basis of its conclusion that the incident in question was not a "traumatic event." A hearing was held before an Administrative Law Judge (ALJ), who concluded that the officer's mishap outside of the garage door constituted a "traumatic event" within the meaning of *N.J.S.A.* 43:16A–7 and that the application should be approved. The

Board rejected the ALJ's conclusion, and issued its final determination denying Kane the requested relief.

Kane appealed the Board's final determination to the Appellate Division, which reversed the Board's decision and remanded with directions that Kane be granted an accidental disability retirement allowance. We granted certification, 99 *N.J.* 160 (1984).

### B. *Canastra v. Board of Trustees, Police and Firemen's Retirement System*

Donald J. Canastra began his employment as a detective for Middlesex County in 1965; he enrolled in the Police and Firemen's Retirement System in 1969. On August 24, 1977, Canastra, while investigating organized crime and vice, was gathering information that would be used to prepare a wiretap affidavit. The mishap at issue here occurred at about 3:30 p.m. when Canastra was returning to headquarters.

As Canastra alighted from an unmarked police car, he stepped on a large stone in the headquarters parking lot. In the officer's words, "[u]pon exiting the vehicle, I wrenched my leg, I went almost to the ground and then I observed that what I had stepped on was a large blue stone." The stone was of a type commonly used in parking areas, although in this instance it was four or five inches in size instead of the usual size of about one inch. Canastra reached for and held onto the car for support but at no time did he make contact with the ground.

Canastra stated that he felt a "funny sensation in the knee" and that he was unable to straighten his right leg. The knee also swelled on the right side. After limping from the parking area to his office, the officer sought medical treatment, which basically consisted of wrapping the knee in a bandage and soaking it in hot water to reduce the swelling. The doctor who examined Canastra also gave him something for pain, although the record is not clear on the amount or type of drug actually used.

Canastra missed approximately two weeks of work on account of the injury. After returning to duty, he did mostly paperwork, and for some time he used a cane to walk. His attendance on the job became sporadic, however, because his knee would swell during the day and he would have to return home to apply heat.

Canastra timely filed for an accidental disability retirement allowance on October 20, 1981. After the Board of Trustees denied the officer's application, a hearing was held before the same ALJ who had presided in the *Kane* matter. The Judge concluded that because the incident in the headquarters parking lot constituted a "traumatic event," an accidental disability retirement allowance should be awarded. The Board rejected that conclusion and issued its final determination denying Canastra the requested relief.

Canastra appealed the Board's final determination to the Appellate Division, which reversed the Board's decision. It held that the officer was entitled to an accidental disability retirement allowance. We granted certification, 99 *N.J.* 160 (1984).

C. *Minner v. Board of Trustees, Police and Firemen's Retirement System*

Woodrow W. Minner began his employment as a patrolman with the Gloucester Township Police Department in 1973, and was enrolled in the Police and Firemen's Retirement System in that same year. On May 25, 1980, Minner, on a one-man patrol, was dispatched to close a fire hydrant that had been opened by area children. In the past he had been called to this very same hydrant.

Arriving at the fire hydrant, the patrolman found that it was open and the water was flowing with full force. Using a steel wrench with a 16-inch handle, Minner attempted to turn the screw part at the top of the hydrant, which controlled the flow of water. He carried the wrench in his patrol car specifically

for that purpose. Minner began striking the handle of the wrench with the palm of his right hand to exert additional force behind each attempted turn of the screw part, despite which the part would not move. Finally, using his shoulder and back to put the weight of his body behind each blow, Minner struck the handle three or four more times and eventually closed the hydrant.

About thirty minutes after the incident, Minner's right wrist allegedly began to swell and, in his words, "started to hurt like a toothache." After soaking his wrist in ice at home, Minner returned to patrol duty. Because his hand was still throbbing, Minner went to the emergency room at the West Jersey Hospital to have the hand examined by a doctor. The x-rays that were taken failed to reveal any evidence of fracture or dislocation, and the hospital report itself did not disclose any finding of swelling. The patrolman's injury was diagnosed as a sprain.

The doctor in the emergency room wrapped Minner's wrist in a bandage and told him to soak it in warm water. He also told the patrolman that he could return to work. Minner thereafter went to his own physician who concurred in the earlier diagnosis of a sprain. Yet, according to Minner, his fingers were starting to "stiffen up" and he still had pain in the wrist.

On June 27, 1980, with his hand "still tender," Minner was called to subdue an irate husband in a domestic squabble. Minner placed the husband under arrest, after which the husband tried to strike him. To control the suspect and to remove him from the room, Minner reached over the suspect's chest with his right hand, the same hand injured in the mishap involving the fire hydrant. Resisting arrest, the husband pulled himself toward a nearby metal door frame, thereby jamming the officer's hand between the frame and the suspect's body. Minner's hand at the time of this incident was lying flat across the husband's chest.

Minner stated that his hand was "badly swollen" as a result of this second incident. The Township's doctor diagnosed a

sprain and applied a splint to the officer's wrist. The wrist remained splinted for approximately a month. Thereafter, the Township's doctor referred Minner to Dr. Mark Nissenbaum, an orthopedist, who specialized in injuries of the hand and arm. Minner stated that he was still experiencing a sharp pain in the wrist at this time.

Dr. Nissenbaum diagnosed the problem as a tear in the scapho-lunate ligament, which holds the scaphoid bone in place. Specifically, the scaphoid bone spans and stabilizes the two rows of bones that constitute the wrist joint. Dr. Nissenbaum recommended a limited form of exploratory surgery to confirm his diagnosis. The surgery, performed on November 7, 1980, suggested to the doctor that his tentative diagnosis had been correct.

Once he was able to observe the wrist joint in the operating room, the doctor proceeded to complete a limited fusion of the scaphoid bone. This procedure was designed to permit the ligament to heal. Although from an objective, physical standpoint the surgery was successful, Minner's complaints increased. The officer lost virtually all movement in his wrist to the point that he could no longer move his hand.

Minner timely filed for an accidental disability pension on September 15, 1981. The Board denied the patrolman's application and a hearing was thereafter held before an ALJ. The Board stipulated at the hearing that the incident on June 27, 1980, constituted a "traumatic event." The Board's position, however, was that this second event was not the direct cause of Minner's disability. It also argued that the incident involving the fire hydrant on May 25, 1980, was not a traumatic event, so that under no circumstances could Minner satisfy the statutory requirements for an accidental disability pension.

The ALJ found in favor of the Board, which issued its final denial of Minner's application on August 23, 1982. We directly certified the Board's decision, 99 *N.J.* 199 (1984).

## II

The Police and Firemen's Retirement System provides retirement allowances and other benefits to the members enrolled in it. *N.J.S.A.* 43:16A–2, *L.* 1944, *c.* 255. The System provides retirement benefits for both ordinary and accidental disability. Benefits for accidental disability are substantially higher than those for ordinary disability, and the eligibility requirements for an accidental disability retirement allowance are more restrictive than those for a retirement allowance on account of ordinary disability. See *N.J.S.A.* 43:16A–6, 43:16A–7.

For a member to be eligible to receive an accidental disability retirement allowance, a medical board appointed by the Board pursuant to *N.J.S.A.* 43:16A–13 must certify that

the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.

[*N.J.S.A.* 43:16A–7.]

The statute also provides that "[p]ermanent and total disability resulting from a cardiovascular, pulmonary or musculo-skeletal condition which was not a direct result of a traumatic event occurring in the performance of duty shall be deemed an ordinary disability." *Id.*

The sole issue in *Kane* and *Canastra* is whether the respective incidents that led to the applicants' injuries in those cases constitute a "traumatic event." *Minner* presents the additional question of whether the officer's disability was the "direct result" of one or both of the events in that case.

Our leading decision dealing with the question of what constitutes a "traumatic event" is *Cattani v. Board of Trustees, Police and Firemen's Retirement Sys.*, 69 *N.J.* 578 (1976). There Cattani, a Trenton fireman, exerted himself to an unusually excessive degree in the course of extinguishing a fire. The fireman was required to put forth this extra work effort on account of a shortage of men in his firefighting unit. While in

the course of performing those duties, Cattani became nauseous and dizzy and had to be administered oxygen by attending medical personnel.

Upon returning to the firehouse, Cattani was rendered temporarily paralyzed. He was removed to a hospital, examined by a doctor, and, having regained the use of his arms and legs, was released. Ten days later, Cattani experienced recurring episodes of paralysis. His problem was eventually diagnosed as a basilar artery occlusion, which is an obstruction of a major blood vessel to the brain. He was also found to be suffering from a preexisting condition of atherosclerosis and type IV hyperlipidemia, which is a condition characterized by an increased amount of fats in the bloodstream.

This Court determined that Cattani was not entitled to an accidental disability pension because an excessive work event could not be considered a "traumatic event." We emphasized that "work effort alone, whether unusual or excessive, cannot be considered a traumatic event, even though it may have aggravated or accelerated * * * [a] preexisting disease." 69 *N.J.* at 586. We also stated: "The phrase 'traumatic event' would ordinarily involve a mishap or accident involving the application of some kind of external force to the body or the violent exposure of the body to some external force." *Id.*

We premised our decision in *Cattani* on the fact that in amending the statute in 1964, the legislature "intended to make the granting of an accidental disability pension more difficult." *Id.* at 584. We noted that

the words "traumatic event" were a significant departure from the term "accident" previously used, plainly indicating that the Legislature did not intend that the workmen's compensation concept of "accident" was to be applied to an accidental disability pension statute.

[*Id.*]

*See also Russo v. Teachers' Pension and Annuity Fund,* 62 *N.J.* 142, 151 (1973) (tracing the history of a similar amendment to the teachers' pension and annuity fund-social security integration law, *N.J.S.A.* 18A:66–39).

Courts since *Cattani*, in a series of both reported and unreported decisions, have struggled with the question of what constitutes a "traumatic event," not only in the context of the Police and Firemen's Retirement System but with regard to similar language in other public employee pension statutes. See *Gerba v. Public Employees' Retirement Sys. Trustees*, 83 *N.J.* 174, 180 n. 3 (1980). The decisions in those cases, cited solely for the purpose of illustrating the level of judicial activity in this area, have not always met with consistent results. See, *e.g.*, *Harris v. State*, No. A–3016–79A (App.Div. May 11, 1984) (found traumatic event where a meter collector wrenched her back as she tried to prevent her collection cart from tipping and spilling the coins); *Coleman v. Board of Trustees, Pub. Employees' Retirement Sys.*, No. A–926–82T3 (App.Div. Sept. 23, 1983) (found traumatic event where worker was injured while trying to push back a falling file cabinet); *Benyacar v. State*, No. A–5269–77 (App.Div. June 4, 1979) (found no traumatic event where teacher was injured when she turned her head to avoid being hit by falling box).

Similarly, the reported decisions do not enjoy consistency in result. See, *e.g.*, *In re Iannelli*, 157 *N.J.Super.* 324 (App.Div.), *certif. den.*, 77 *N.J.* 488 (1978) (inhalation of toxic smoke and fumes held to be traumatic event); *In re Sigafoos*, 143 *N.J.Super.* 469 (App.Div.), *certif. den.*, 72 *N.J.* 458 (1976) (found traumatic event where police officer, while balancing television set on his leg, injured his back when he grabbed the set to prevent it from falling); *Magnani v. Public Employees' Retirement Sys.*, 142 *N.J.Super.* 262 (App.Div.1976) (series of events that included being thrown to ground while operating jackhammer held not to be a traumatic event).

In reviewing these decisions and the various factual contexts in which injuries may arise, we remain convinced, as we were in *Cattani*, that the legislature intended that an accidental disability pension ought to be awarded in cases of serious and permanent harm to the worker, in which the worker himself is exposed to a violent level of force or impact. That some

confusion has developed in respect of *Cattani*'s definition of "traumatic event" is now apparent. We hope by today's decision to bring clarification to the area.

██ We think it consonant with the legislative intent to characterize a traumatic event as one that arises in cases in which a worker involuntarily meets with a physical object or some other external matter and is victim of a great rush of force or power that he himself did not bring into motion. As *Cattani* makes clear, the focus of inquiry is on the event itself rather than the injury. 69 *N.J.* at 586. The force or power must originate from sources other than the injured party. Hence, to be eligible for accidental disability retirement allowance, a worker must demonstrate (1) that his injuries were not induced by the stress or strain of the normal work effort; (2) that he met involuntarily with the object or matter that was the source of the harm; and (3) that the source of the injury itself was a great rush of force or uncontrollable power.

Some examples may serve to illustrate the point. A firefighter who, after battling a blaze over an extended period, is gradually affected by the heat and flames until he suffers definite injury and harm; his injury is part of the stress and strain of his duty and does not qualify him for an accidental disability retirement allowance. The same would be true of the fireman who strains his back while lifting a heavy ladder or one who injures himself while climbing onto the back of the firetruck to retrieve additional hose. By way of contrast, a fireman who is thrown off the roof of a building by a sudden explosion or a burst of flames suffers an injury that is not part of the strain of normal duty but rather is a consequence of an involuntary mishap involving considerable force and power. The same would be true of the fireman who is struck by a falling beam or who falls off the top step of a tall ladder. Both incidents would be viewed as traumatic events within the meaning of the statute.

 Under the forgoing approach, none of the mishaps in the cases before us may properly be termed a traumatic event. Officer Kane did not come into contact with the ground or garage door, nor did he fall victim to a great rush of force or power. The officer merely twisted his ankle and knee by shifting his own body weight. Although we do not seek to diminish the level of pain or injury that Kane must have experienced, we are constrained to conclude that this type of mishap is very much what the legislature had in mind both when it enacted the Workers' Compensation Act and when it provided for an ordinary rather than accidental disability pension. As *Cattani* and our further explication today seek to make clear, accidents such as that experienced by Officer Kane were surely *not* within the legislature's contemplation when it approached the question of an accidental disability retirement allowance.

 Officer Canastra's case is of the same genre: he did not meet with a great level of force but merely stepped on a stone in the parking lot of police headquarters. He, like Kane, may have suffered a permanent injury, but that in and of itself is not enough. The legislature intended that there be an additional demonstration of a traumatic event before an officer could become entitled to an accidental disability pension under *N.J. S.A.* 43:16A–7. That showing has not been made here.

 Moreover, there are two events at issue in *Minner*: the mishap surrounding the fire hydrant on May 25, 1980, and the incident involving the irate husband on June 27, 1980. We need not concern ourselves with this latter situation since the parties have stipulated that it constituted a traumatic event. With regard to the occurrence involving the fire hydrant, we do not accept the contention that this too was a traumatic event. Minner voluntarily subjected his wrist to injury by pounding his open palm against the handle of the steel wrench. Therefore, the injury did not originate in an involuntary exposure to a physical object; indeed, Minner became victim to a source of

power that he himself put in motion. Moreover, Officer Minner had been to that very hydrant in the past to perform the identical task, namely, closing the open valve to halt the flow of water. Hence, it is worth repeating that "work effort alone, whether unusual or excessive, cannot be considered a traumatic event * * *." *Cattani, supra,* 69 *N.J.* at 586. We conclude that the closing of the hydrant was part of Minner's normal work effort, as he himself admits, and cannot be used to qualify the officer for an accidental disability retirement allowance.

### III

The final issue before us in *Minner* is one of causation. Specifically, the question is whether the mishap involving the irate husband on June 27, 1980, which, as noted, has already been stipulated as constituting a traumatic event, was "the essential significant or substantial contributing cause of the [officer's] disability." *Gerba v. Board of Trustees of the Pub. Employees' Retirement Sys.,* 83 *N.J.* 174, 187 (1980).

In concluding that the incident on June 27, 1980, was not the direct cause of Minner's disability, the ALJ considered the extensive oral testimony of the Board's expert, Dr. Henry Sherk, and the lengthy deposition of the patrolman's orthopedist, Dr. Nissenbaum. As noted earlier, Nissenbaum is the same physician who performed the limited fusion of Minner's scaphoid bone, which spans and stabilizes the two rows of bones that constitute the wrist joint.

Dr. Sherk was of the opinion that the patrolman's disability was a response to a post-operative condition known as "chronic pain syndrome." This syndrome is basically a disruption of the normal brain control over the function of a hand or foot that is developed as an emotional and psychological response to a relatively minor injury. However, when pressed to testify in respect of the more physical aspect of Minner's condition, Dr. Sherk concluded that the incident over the fire hydrant was

"the major precipitating event" and that the second incident was merely "an aggravation of the precipitating episode."

Dr. Nissenbaum was of the view that Minner's problems resulted from "one or both" of the events at issue. He therefore declined to distinguish between the two episodes for the purpose of determining causation. However, when pressed on cross-examination, the doctor admitted that the first incident was "more likely to have caused the injury" because of the fact that "[c]lassically, twisting motions are what cause this particular problem and [Minner's] first injury was more of a twisting motion than [his] description of his second [injury]." Hence, the testimony of the patrolman's own expert permits the conclusion that the incident on June 27, 1980, was not in fact the substantial contributing cause of Minner's injuries.

█ Our careful review of the record leads to the conclusion that the determination of the ALJ regarding causation, later adopted by the full Board, is amply supported by "substantial credible evidence." *In re Suspension of License of Silberman*, 169 *N.J.Super.* 243, 255 (App.Div.1979), *aff'd*, 84 *N.J.* 303 (1980). We therefore have no reason to disturb that finding. *Cf. Hiering v. Board of Trustees of Pub. Employees Retirement Sys.*, 197 *N.J.Super.* 14 (App.Div.1984) (determination of Board not supported by evidence and therefore reversed on appeal).

We are of course mindful of the general rule that "statutory pension provisions are to be liberally construed in favor of public employees * * *." *Fiola v. New Jersey, Dep't of Treasury*, 193 *N.J.Super.* 340, 347 (App.Div.1984); *see also* 3 Sands, Sutherland, *Statutory Construction* § 71.09 (4th ed.1974) (citing cases to the same effect). However, it is equally true that "such a liberal construction is put upon the statute only to effect the legislative purpose." *Salz v. State House Comm'n*, 32 *N.J.Super.* 230, 235 (App.Div.1954). As we have stated in *Cattani* and again today, the legislature's purpose in amending *N.J.S.A.* 43:16A–7 was to make recovery under that provision

more difficult rather than easier. We seek today only to effectuate that purpose.

The requirements of *N.J.S.A.* 43:16A–7 not having been satisfied, none of the officers in these cases is entitled to an accidental disability retirement allowance. Hence, the judgments of the Appellate Division in *Kane* and *Canastra* are reversed, and the denial by the Board of the officer's application in *Minner* is affirmed.

So ordered.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—7.