WILLIAM DUIGNAN, PETITIONER–APPELLANT, v. BOARD OF TRUSTEES, PUBLIC EMPLOYEES' RETIREMENT SYSTEM, RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 8, 1988—Decided March 3, 1988.

Before Judges PETRELLA, DREIER and ASHBEY.

*Alfred G. Osterweil* argued the cause for appellant (*Alfred G. Osterweil*, on the brief).

*Patrice M. Connell*, Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards*, Attorney General of

New Jersey, attorney; *Michael R. Clancy,* Deputy Attorney General, of counsel; *Patrice M. Connell,* on the brief).

The opinion of the court was delivered by

DREIER, J.A.D.

Petitioner appeals from the denial of his accidental retirement benefits claim by respondent, Board of Trustees of the New Jersey Public Employees' Retirement System (Board). This is the second time this case is before us. As we noted in our earlier unpublished opinion, petitioner suffered an on-the-job injury five months and five days short of his 65th birthday, but did not file an application for accidental disability retirement benefits until December 7, 1982 when he was four months and 14 days beyond his 65th birthday. The Board refused even to issue him the requisite forms to file his claim. We reversed and directed that the Board accept the application *nunc pro tunc* as of the day the original request had been made. On remand, the Board was to determine whether the statute

was intended to apply to the kind of case where an employee is traumatically injured a short time before age 65, undergoes 'a number of surgical procedures' and, when they are ineffectual to correct the injury, is diagnosed as permanently and totally disabled at a time after he attained age 65.

We remanded the matter for a hearing before an administrative law judge and instructed the Board

to determine the legislative intent and to give a fair and practical interpretation with reference to the purposes of the retirement act....

In April 1986 the Board denied the application commenting that although the application had been filed "out of time," it would comply with the direction of the Appellate Division and entertain the merits. It then determined that the accident was not a traumatic event within the meaning of *N.J.S.A.* 43:15A–43, and that petitioner was not totally and permanently disabled as a result of the incident. The matter was then heard by an administrative law judge as a contested case. After evidentiary hearings in January 1987, the administrative law judge issued his recommended decision on issues other than the age qualifi-

cation. The judge found in favor of petitioner on both the question of traumatic event and total and permanent disability as a result of the trauma. The Board, however, on review of the recommended decision rejected the administrative law judge's recommendations regarding both the disability and the character of the event; it further ruled that petitioner's application was barred by the age restriction of *N.J.S.A.* 43:15A–43. While we recognize the Board's expertise in matters submitted to its jurisdiction, we are constrained to disagree both with the Board's interpretation of the governing statute and with its factual determinations based upon our view of the applicable legal standards defining a traumatic event and total disability. *See Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 93 (1973), and *Campbell v. Dept. of Civil Service,* 39 *N.J.* 556, 562 (1963).

Petitioner was employed as a custodian for the Bergenfield Board of Education since December 1976 and was enrolled in the Public Employees' Retirement System (PERS) in June 1977. One of the usual school-custodian duties performed by petitioner was sweeping floors with a push broom, the base of which was approximately three feet long with attached hair bristles. The accident occurred as petitioner was hanging the broom on a bracket near a shelf. In his words:

> The broom turned in my hand and it came back. It bounced off the shelf. I turned my head and the edge of the broom caught my eye across my eye.
> THE COURT: Which part of the broom caught you across the eye?
> THE WITNESS: The bristles on the broom.

Elsewhere in the transcript petitioner stated:

> ... I misjudged going in and hit the shelf, and it rolled around in my hand and it pulled away and it caught the corner of my eye.
>
>      *      *      *      *      *      *      *      *
>
> Q. Did you have time or did you try to do anything to avoid the brush bouncing back and having the bristles hit you in the eye?
> A. Well, I bucked. I moved my head back, I moved my head, but I turned it in my hand and it just caught the edge of my eye. I tried to move away from it, but I guess I didn't move fast enough.
>
>      *      *      *      *      *      *      *      *
>
> Q. Did you move backwards before or after the bristles got you in the eye?

A. When the broom hit the shelf and it came back, I moved my head as I seen it coming because I couldn't get out of the way. In fact, the broom, as it came back, I moved my head and it just caught my eye.

After the accident, petitioner was sent home for the day. Although he tried to work the next day, he had to stop work because his eye had completely closed. He was unsuccessfully operated on three times, and he never returned to work after the third operation. At the hearing in November 1986 petitioner stated that he had lost the sight in his right eye and was unable to drive a car. He had to wear sunglasses at all times, even indoors, due to light sensitivity. The eye continually burned and watered, causing headaches. He lacked peripheral vision and could not see a child or anyone who came up to him on his right side to cross in front of him. He was unable to climb ladders or use tools, and lifting placed a strain on the right side of his face further aggravating the condition to his eye. He lacked the ability to judge distance properly and felt helpless. He could not do what he was supposed to do and could not go to work.

Petitioner's expert testified that there was a total loss of vision in petitioner's right eye allowing him to see shadows only. He stated that the eye impairment was caused by the broom episode, noting that as a result of earlier cataract operations his eyes were more susceptible to trauma than normal eyes would have been. The doctor further testified that although petitioner may be physically capable of performing some of the duties of a custodian, his age and emotional response to his condition, combined with the chronic inflammation of the eye and lack of vision, caused petitioner to be unable to perform the duties of a custodian. As to the physical mechanics of the injury the doctor testified that when the broom bristles brushed against petitioner's eye there was "a considerable trauma," especially on petitioner's "weakened eye," and possibly "on any eye."

The Board's expert agreed that petitioner was blind in his right eye, but thought petitioner would be able to continue performing his duties as custodian. He noted, however, that

the opinion was given on an objective basis and did not take into consideration either petitioner's poor emotional adaptation to his injury or the continual tearing of the eye. When the administrative law judge questioned him further as to what his opinion would have been taking into account petitioner's emotional and/or psychological response to the injuries and the strenuous nature of some of the custodian duties, the Board's expert stated:

> ... I don't think that I should have to do that and as far as if Mr. Duignan was, for instance, my patient, I would probably say that he was incapacitated. But since I'm examining him from a point of view of being able to work without taking into effect the fact that he is affected I think prior to his condition, then I would probably say, yes, he would be incapacitated. His mental status, of course, can improve, his visual status cannot, it's permanent.

## I

We first consider the Board's interpretation of *N.J.S.A.* 43:15A-43, which it determined as a matter of law barred petitioner's claim. The statute, in pertinent part, reads:

> A member who has not attained age 65 shall, upon the application of the head of the department in which he is employed or upon his own application or the application of one acting in his behalf, be retired by the board of trustees, if said employee is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties, on an accidental disability a'lowance....
>
> The application to accomplish such retirement must be filed within five years of the original traumatic event, but the board of trustees may consider an application filed after the five-year period if it can be factually demonstrated to the satisfaction of the board of trustees that the disability is due to the accident and the filing was not accomplished within the five-year period due to a delayed manifestation of a disability or to circumstances beyond the control of the member.[1]

With respect to the timeliness of petitioner's application, we must examine the specific legislative directive, the evident purpose of the statute, and this court's prior interpretation of the statute in *Hillman v. Bd. of Trust., Pub.Emp.Ret.Sys.*, 109

---

[1]The statute was amended in 1986 to include the voluntary performance of duties before or after the regular hours of employment. In addition to the quoted sections, the statute exempts permanent and total disability resulting from a cardiovascular, pulmonary or musculo-skeletal condition which was

*N.J. Super.* 449 (App.Div.1970). The first paragraph of the statute, stripped of verbiage relating to who shall file the application and to the work-related aspect of the trauma (neither point being an issue here), reads:

> A member who has not attained age 65 shall ... be retired by the board of trustees, if said employee is permanently and totally disabled ... on an accidental disability allowance.

The Board reads this provision as requiring the application to be filed before the employee attains age 65. We see no such intention in the statute when it is read against the second paragraph. The second paragraph of the statute states when the application must be filed:

> The application to accomplish such retirement must be filed within five years of the original traumatic event....

The statute then continues and provides in appropriate instances for a relaxation of this five-year filing limitation. The Legislature authorizes deferring filing in "delayed manifestation" cases or where other appropriate circumstances exist.

The obvious objective of the statute is to aid the employee traumatically injured on the job and thereby rendered totally disabled. Where the Legislature has determined that claims filed by older employees should not be considered, it has acted by amending the age limitation. *L.*1966, *c.* 67 § 4, *N.J.S.A.* 43:15A–43 was amended to reduce the age criterion from 70 to 65 and to add the present eligibility definition.

While we may not ignore clear legislative limitations, there is no question that we as a "reviewing court may look beyond the specific language of the delegating statute to the objective of the statute." *D.S. v. East Brunswick Tp. Bd. of Ed.*, 188 *N.J.Super.* 592, 598 (App.Div.), certif. den. 94 *N.J.* 529 (1983). Were the acceptance of an application by an employee who has attained age 65 for an injury occurring prior to his 65th birthday not encompassed by this statute, an anomalous result

---

not a direct result of traumatic injury occurring in the performance of duty, and the statute requires a medical certification procedure for the determination of total disability.

would be reached. An employee injured at age 60 would have five years to file his claim; an employee injured at age 64 would have but one year; an employee injured the day before his 65th birthday would have but one day. As here, if an employee is injured before his 65th birthday, but is being treated and hopefully will not become permanently disabled, he would still be forced to file an immediate claim for total disability even though he expected a full recovery. Petitioner here underwent three operations, any of which could have been successful thereby obviating the claim here filed. The Legislature took notice of such a delayed filing possibility and compassionately enacted the second paragraph of section 43, quoted earlier.

The State has argued that if petitioner's interpretation is accepted, there may be employees who retire on an ordinary disability retirement who later prove the claim of accidental disability, and the State cannot change the status of the employee at that point. To this argument we answer: Why not? Upon proof of the requisite facts, and a timely application within the five-year or extended period provided by the statute, the employee's retirement status could be amended. Administrative inertia cannot be a reason to deny justice. The Legislature has established the criteria, and if a petitioner meets the criteria, the benefits must be awarded.

The Board notes that this court in *Hillman, supra,* previously considered a related problem and that dictum in the case apparently opposes the result we reach here. In *Hillman* a petitioner both was injured and applied for accidental disability retirement benefits prior to age 65. The Board did not consider the petition until after petitioner attained the age of 65 and denied the petition on that basis. We there stated:

It would hardly be consonant with the laudable purpose of the act to defeat a petitioner's claim by applying a questionably strict application such as respondent Board here advances. [109 *N.J.Super.* at 456].

Further,

Given the liberal construction to be applied to a pension statute, and given the illogic of deeming the sometimes belated operation of the administrative ma-

chinery to be the controlling factor, the statutory consideration contended for by petitioner is by far the more reasonable one. [*Id.* at 457].

However, in dictum, we there stated:

The construction which we consider most consistent with the general statutory pattern, the language of section 43, and the fundamental interests of both the applicant and the Board, is that requiring the applicant to be under 65 at the time he makes his application for retirement. This properly places the initial responsibility for diligence on the applicant; thereafter, his rights may not be adversely affected by actions or facts over which he has no control. [*Id.* at 455–456].

The parties and the court in *Hillman,* however, had assumed that the statute required that an application be filed by age 65, a point which we have analyzed above and found to be lacking in foundation. It was an issue not there briefed, argued or decided, and we therefore reject this dictum, which was stated in the context of the ameliorative result directed by the *Hillman* court.

Although not raised by the parties, we have noted an anomaly in the statute that could be read as reenforcing the Board's position. *N.J.S.A.* 43:15A–46 provides for the amount of the accidental disability retirement allowance. The section is preceded, however, by the phrase:

A member under 65 years of age upon retirement for accidental disability shall receive a retirement allowance which shall consist of. . . .

This section, read with section 43, shows why in *Hillman* we noted that "[w]e are faced with unfortunately worded statutory provisions." 109 *N.J.Super.* at 455. We there noted, however, that

Our task is to give that language a fair and practical interpretation with reference to the purposes of the retirement act. Pension statutes are to be liberally construed to effectuate their remedial intent. As we said in *Kochen v. Consolidated Police, etc., Pension Fund Comm'n,* 71 *N.J.Super.* 463, 478 (1962), such construction 'resolves all reasonable doubts in favor of the applicability of the statute to the particular case.' *Cf. Roth v. Board of Trustees, etc.,* 49 *N.J.Super.* 309, 319 (App.Div.1958). [*Ibid* ].

Applying the same principles here, we interpret section 46 as applying to a member injured prior to attaining age 65 who otherwise qualifies for the accidental disability retirement allowance. Such a reading does no violence to the Act since it

gives effect to the five-year, or extended, permissible filing period expressly stated in section 43.

Since we have determined that petitioner was entitled to apply for benefits, we need not reach his substantive due process argument that the age-based restriction bears no rational relation to the purpose of the statute or his equal protection claims. We only note, as we did in our earlier opinion, that

[c]onstitutional questions should not be treated and determined unless absolutely imperative to the disposition of the litigation.

## II

■ The Board next contends that the blinding of petitioner by the bristles of the broom striking his eye was not a "traumatic event" within the meaning of *N.J.S.A.* 43:15A–43. The Supreme Court has defined the term in *Kane v. Board of Trustees, Police & Firemen's Ret. Sys.*, 100 *N.J.* 651, 663 (1985):

[T]o be eligible for accidental disability retirement allowance, a worker must demonstrate (1) that his injuries were not induced by the stress or strain of the normal work effort; (2) that he met involuntarily with the object or matter that was the source of the harm; and (3) that the source of the injury itself was a great rush of force or uncontrollable power.

The administrative law judge found that the first two elements of the *Kane* test had been "easily met." The third, while "more difficult," was also satisfied:

[I]f the bristles of the brush had struck petitioner in the forehead, the chin, or the shoulder, perhaps no 'great rush of force' would have occurred. The eyeball, however, is different. I can and do take official notice that the eye is one of the most sensitive parts of the human body and is particularly vulnerable to trauma. With respect to petitioner's eye, the stiff bristles of the broom struck the eyeball with a rush of force sufficient to detach the retina and to cause permanent and total loss of vision.

The concept of 'traumatic event' is not fixed and absolute. It will, and should, vary from circumstance to circumstance, and perhaps even from individual to individual. On March 16, 1982, the petitioner sustained a rush of force to his right eye just as surely as if he had been struck in that eye by a baseball bat or a hurled rock. In terms of insult to his body, he clearly sustained a 'traumatic event.'

The Board determined, however, that the movement of the broom had originated with petitioner as he attempted to hang

the broom on its bracket. It considered the statement in *Kane* that "[t]he force or power must originate from sources other than the injured party," 100 *N.J.* at 663, to mean that the incident in question here could not be a "traumatic event." Further, the Board at oral argument before us advanced the position that if the force was so slight that it ordinarily would not injure the body, the fact that it happened to strike the sensitive surface of petitioner's eye would not cause the event to become "traumatic" in that there was no "great rush" of force.

We determine that the Board has placed too restrictive an interpretation upon the language of *Kane*. In an organ as sensitive as the eye the invasion of broom bristles can be "a great rush of force or uncontrollable power." One must look at the organ affected to determine what force is necessary to be considered traumatic. A pellet fired from a gun that may have easily bounced off the surface of one's skin, but which causes blindness by hitting an eye cannot be dismissed as non-traumatic. Here, the bristles of the broom striking the surface of petitioner's eye, susceptible to injury as a result of prior operations, was no less a trauma than would have been any projectile. It was characterized by petitioner's physician as "a considerable trauma." We also find that the fact that the broom did not fall from high above petitioner's head or was not propelled rapidly towards him from a considerable distance did not lessen the fact that something had gone awry. Petitioner had lost control of the broom and this was the cause of the bristles striking the eye. We find that this circumstance, a mishap causing the outside force to his body, was traumatic, considering the part of the body involved and that the Legislature intended to include such an incident within the definition of *N.J.S.A.* 43:15A–43.

### III

Lastly, we consider the issue of petitioner's permanent and total disability. The Board declined to consider the administra-

tive law judge's finding in petitioner's favor on this point, since the Board had already found that no traumatic event had occurred and that petitioner was procedurally disqualified from filing his claim. We determine that the administrative law judge's analysis accurately resolved the initial conflict between the experts. He properly observed that the conflict disappeared on cross-examination of the physician called by the Board. The judge determined that the experts

were in essential agreement, the only difference being that Dr. Klein's [petitioner's expert] opinion was based on the whole man whereas Dr. Murto's [the Board's expert] was more narrowly focused. Since it is the whole man we must consider, Dr. Klein's opinion in this matter should be given more weight.

As we quoted earlier, the Board's expert agreed that if petitioner were his patient, presenting the full panoply of his background and symptoms, he also would have found total disability.

The decision of the Board of Trustees of the Public Employees' Retirement System is reversed. The matter is remanded to the agency with directions that the application filed by petitioner should be granted and petitioner be retired on an accidental disability retirement allowance.