231 N.J. Super. 211 (1989)
555 A.2d 642
MARTIN J. QUIGLEY, PETITIONER-APPELLANT,
v.
BOARD OF TRUSTEES OF THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM, RESPONDENT-RESPONDENT.
RAYMOND HILSMAN, PETITIONER-APPELLANT,
v.
BOARD OF TRUSTEES OF THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 10, 1989.
Decided February 17, 1989.
*213 Before Judges ANTELL, DREIER and BROCHIN.
Stephen A. Satkin argued the cause for appellant Martin J. Quigley (Craner, Nelson, Satkin & Scheer, attorneys; Stephen A. Satkin and Norman W. Albert, on the brief).
Martin H. Kuner argued the cause for appellant Raymond Hilsman (Tepper and Scherling, attorneys; Martin H. Kuner on the brief).
Juan J. Gonzalez, Deputy Attorney General, argued the cause for respondent in A-2988-87T8 (Cary Edwards, Attorney General of New Jersey, attorney; Michael J. Haas, Deputy Attorney General, on the brief).
Kathe F. Mullally, Deputy Attorney General, argued the cause for respondent in A-4349-87T1 (Cary Edwards, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, on the brief).
The opinion of the court was delivered by BROCHIN, J.S.C. (temporarily assigned).
Raymond Hilsman and Martin J. Quigley each applied to the Board of Trustees of the Public Employees' Retirement System for accidental disability retirement benefits pursuant to N.J.S.A. 43:15A-43. Each petitioner's application was denied, he appealed, and his appeal was heard before an administrative law judge. In Hilsman's case, the administrative law judge recommended a decision in favor of the petitioner, but the Board of Trustees of the Public Employees' Retirement System declined to follow the judge's recommendation, and it reached a final administrative decision denying accidental disability benefits. *214 In Quigley's case, the administrative law judge recommended denying accidental disability benefits and the Board accepted his decision. The petitioners appeal those final administrative determinations to this court.
Benefits under N.J.S.A. 43:15A-43, which are substantially higher than ordinary disability retirement benefits, are available to an otherwise eligible employee only if that "employee is permanently and totally disabled as a direct result of a traumatic event" which has occurred as the result of his employment. Ibid. Hilsman's and Quigley's petitions were each denied because the event which caused his disability was not a "traumatic event" and because even if the event was "traumatic", the disability was not the "direct result" of that event as those terms are used in the statute.
Although Hilsman's and Quigley's cases involve different facts and were not consolidated either before the PERS Board or before this Court, we have consolidated these matters for the purpose of this opinion. We deal with both cases together because they both require us to interpret the meaning of, and to apply, "traumatic event" and "direct result" as those terms are used in N.J.S.A. 43:15A-43. We approach the task in the light of several recent decisions of the New Jersey Supreme Court, including Maynard v. Board of Trustees, 113 N.J. 169 (1988); Ciecwisz v. Board of Trustees, 113 N.J. 180 (1988); and Kane v. Board of Trustees, Police & Firemen's Ret., 100 N.J. 651 (1985).

1

"TRAUMATIC EVENT"
On February 15, 1985, Raymond Hilsman was employed as a truck driver by the Jersey City Board of Education, and was delivering furniture and packages to a Jersey City high school. When he arrived at the school, he and two other men parked their truck next to a curb and a flight of approximately twenty steps leading up to the entrance to the school. After parking the truck, Hilsman began to carry the chairs, tables and packages *215 from the front to the rear of the truck. From there he handed them down to the two men standing on the ground. As he was carrying a stack of chairs and several packages toward the rear of the truck for unloading, he went to step onto the tailgate before starting the hydraulic lift to lower the tailgate to the ground. However, without Mr. Hilsman's being aware of it, someone else had moved the control lever, and the tailgate was already descending. He stepped into space, lost his balance, threw the chairs and packages out of his arms and fell from the back of the truck, which was about five feet off the ground, onto the descending tailgate and from there onto the first few stairs leading into the school building, striking the railing as he landed.
On January 17, 1983, Martin Quigley was employed as maintenance worker for the New Jersey Turnpike Authority. On that date he was assigned to wash a vehicle known as a "tandem rack" truck. The running board of the truck was approximately four feet above the ground. While washing the truck, he slipped on a sudsy solution and fell to the concrete floor, striking his lower back and causing what he described as "terrible pains" in his lower back area.
In both Hilsman's and Quigley's case, the first question is whether the petitioner suffered a "traumatic event" within the meaning of N.J.S.A. 43:15A-43.
The legislative history of the phrase, "traumatic event" as used in N.J.S.A. 43:15A-43 has been discussed in Cattani v. Board of Trustees, Police & Firemen's Retire. Sys., 69 N.J. 578, 583 (1976) and the cases cited therein. See also Maynard v. Board of Trustees, 113 N.J. 169, 172 (1988). The only insight which that legislative history yields is that "the inclusion of the word `traumatic event' was `intended to make the granting of an accidental disability pension more difficult.'" Maynard v. Board of Trustees, supra, at 172, quoting Cattani v. Board of Trustees, Police & Firemen's Retire. Sys., supra 69 N.J. at 584.
*216 Precisely which kinds of work related accidents are, and which are not, "traumatic events" within the meaning of the statute is not self-evident from the statutory language itself, and court decisions on the issue have been inconsistent. For example, in Gerba v. Public Employees' Retire. Sys. Trustees, 83 N.J. 174 (1980), an employee claiming accidental disability benefits had been struck and knocked down by a truck and a load of pallets had fallen on him, and at a later date he had slipped on an oil spot or spill and had fallen against a parked truck, striking his lower back. Although the court held against the employee on the ground that his disability was not the "direct result" of either of those incidents, it viewed each of them as a `traumatic event' within the meaning of N.J.S.A. 43:15A-43. Id. at 188. Similarly, in Korelnia v. Pub. Employees' Retire. Sys. Trustees, 83 N.J. 163 (1980), the Court held that when an employee who was loading a fire extinguisher onto a station wagon slipped, jumped back from the extinguisher in order not to get hit and struck his spine on the tailgate of the station wagon, the fall was a "traumatic event." Id. at 166. However, in Maynard v. Board of Trustees, 113 N.J. 169 (1988), the court held that a teacher who sustained serious injuries as a result of slipping and falling on a highly polished school floor, striking the back of the right side of her head on a bench and then landing on the floor on her back, did not suffer a "traumatic event." Id. at 175. The Court expressly held that a slip and fall, at least when it did not result in the employee's falling to a level lower than that upon which she had been standing, is not a "traumatic event", and it disapproved Gerba and Korelnia to the extent that those cases indicated a contrary conclusion. To the same effect see Ciecwisz v. Board of Trustees, 113 N.J. 180 (1980).
In each of the cases now before us, the claimant sustained an injury as the result of a fall which involved a drop of several feet. Hilsman fell five feet from the back of a truck, although his fall was punctuated by his coming into contact with the descending tailgate of the truck and with the stairway railing *217 before he landed on the lower steps of the entrance way into the school. Quigley slipped and fell four feet from the running board of the truck and landed on his back on a concrete floor. None of the accidents which were actually involved in Maynard, supra, Ciecwisz, supra, Kane, supra, or Korelnia, supra, involved falls from higher than ground level.
In Kane, after noting that the reported and unreported decisions construing "traumatic event" "do not enjoy consistency in result", Kane, supra, 100 N.J. at 652, the Court set about "to bring clarification" to the area. Id. at 663. In categorical terms, the court stated:
[T]o be eligible for accidental disability retirement allowance, a worker must demonstrate (1) that his injuries were not induced by the stress or strain of the normal work effort; (2) that he met involuntarily with the object or matter that was the source of the harm; and (3) that the source of the injury itself was a great rush of force or uncontrollable power. [Id. at 663.]
As applied to the present cases, the first two elements of the Court's definition of "traumatic event" present no problem. Hilsman sustained an injury to his knee, and Quigley an injury to his back. Neither injury was induced by the stress or strain of his normal work effort. Each of them met involuntarily with the object or matter that was the source of the harm; Hilsman, with the bottom step of the stairs leading to the Jersey City school, and Quigley, with the concrete floor of the area on which the truck which he was washing was parked. However, whether "the source of the injury itself was a great rush of force or uncontrollable power", the third element of the Court's formula, is more obscure.
At first blush, there does not appear to be anything in the facts surrounding either Hilsman's or Quigley's injuries which would ordinarily be described as "a great rush of force or uncontrollable power." However, the examples which the Court provides to illustrate the meaning of its language suggest a different conclusion. Guidance is offered by the following somewhat cryptic passage:

*218 A fireman who is thrown off the roof of a building by a sudden explosion or a burst of flames suffers an injury that is not part of the strain of normal duty but rather is a consequence of an involuntary mishap involving considerable force and power. The same would be true of the fireman who is struck by a falling beam or who falls off the top step of a tall ladder. Both incidents would be viewed as traumatic events within the meaning of the statute. [Kane, supra, 100 N.J. at 663]
The first two illustrations, the fireman who is thrown off the roof of a building by a sudden explosion or a burst of flames, and the fireman who is struck by a falling beam, are consistent with the requirement that "the source of the injury itself was a great rush of force or of uncontrollable power." But no external "force" or "power" is mentioned in the hypothetical case of a fireman who suffers a "traumatic event" by falling off the top step of a tall ladder. However, in Maynard v. Board of Trustees, supra, 113 N.J. at 175, the Court explains that two of the claimants whose cases were actually decided by Kane slipped and fell, but were found not to be entitled to accidental disability benefits, not because they did not strike the ground, but because "In slip and fall cases, no force or power originates anywhere except from the person falling. Any gravitational force that is generated by the fall is not `great', as that term was used in Kane." In general, the further a body falls, the greater its speed when it strikes the ground and the greater the apparent upward force which the ground exerts to stop the fall. We infer that it is that apparent resistive force, whose magnitude depends on the height from which a body has fallen, to which the court in Maynard was referring as either "great" or less than "great."
Unfortunately, we are unable to discern how high a fall will be sufficient to impose a force which we should consider great enough for the fall to be a "traumatic event" within the meaning of N.J.S.A. 43:15A-43. In the cases now before us, each of the claimants fell from a height greater than ground level. Therefore, they are not disqualified by Maynard, supra and Ciecwisz, supra. But their falls were not from a height as great as the top of what a fireman would consider a tall ladder. *219 We are conscious of the admonition that our "focus of inquiry is to [be] on the event itself, not the injury." Maynard, supra, 113 N.J. at 174. Without any further guidance, we hold that the force imposed on Hilsman when he fell five feet from the back of a truck and on Quigley when he fell four feet from a running board was great enough for each of those accidents to be a "traumatic event." We therefore turn next to the question whether the petitioners' ensuing disabilities were the "direct result" of those traumatic events.

2

"DIRECT RESULT"  HILSMAN
When Hilsman fell from the truck on February 15, 1985, he fell on both knees and then rolled over on his back. His knees and back both hurt.
On February 25, 1985, he was examined and treated by Dr. Edward D. Mastromonaco, a board certified orthopedic surgeon. Because the pain persisted despite conservative treatment, Dr. Mastromonaco operated on September 24, 1985, removing and resecting a portion of a torn cartilage in Hilsman's right knee. Dr. Mastromonaco's report of his post operative diagnosis was, degenerative changes to the internal structure of petitioner's right knee. However, in his testimony before the administrative law judge, Dr. Mastromonaco referred to an "acute tear of the degenerative meniscus" and added, "It's a recent tear." He expressed the opinion that the February 15, 1985, incident was the direct cause of the injuries to Hilsman's right knee and also caused the aggravation of a preexisting injury to his left knee. According to Dr. Mastromonaco, but for the February 15, 1985, injury, Hilsman would have been able to continue in his employment for at least another ten years, well past normal retirement age, because the symptoms were not present until the accident which tripped the pain and swelling.
Dr. Harold J. Bennet, the orthopedist who examined the claimant for the Division of Pensions, expressed the opinion *220 that Hilsman's problems with his right knee were all the result of developmental osteoarthritis and degenerative changes in his knee and in other systems, including his high blood pressure and overweight condition. He was of the view that a traumatic injury could cause these underlying conditions to flare up, but that the degenerative changes, without the traumatic injury, would themselves have been sufficient to disable the claimant from continuing his employment.
After summarizing the medical testimony, the administrative law judge pointed out that Hilsman had been able to do his job before the February 15, 1985, accident even though his left knee bothered him occasionally. The judge concluded that since petitioner did not become permanently and totally disabled until after the injury and the subsequent operation on his right knee, his inability to work was the direct result of the February 15, 1985, event and that he was, therefore, entitled to an accidental disability pension.
The Board of Trustees of the Public Employees' Retirement System rejected the administrative law judge's initial decision. On the basis of an independent review of the record, the Board concluded that Dr. Bennett's opinion was entitled to greater weight than Dr. Mastromonaco's, and accordingly found that petitioner's condition was the result of a "combination of developmental degenerative arthritic changes in both of Hilsman's knees exacerbated by a chronic significant overweight condition and systemic degenerative changes caused by high blood pressure." The Board therefore held that Hilsman's February 15, 1985, fall merely aggravated his preexisting problems and was not the substantial contributing cause of his disability.
In considering the appeal from the decision of the Board of Trustees, we are cognizant that we are reviewing its findings and not those of the administrative law judge. In re Suspension of License of Silberman, 169 N.J. Super. 243, 255-256 (App.Div. 1979), aff'd. o.b. 84 N.J. 303 (1980). To the extent that Dr. Bennet's opinion differs from Dr. Mastromonaco's, there *221 was sufficient credible evidence in the record to support their choice and we are therefore bound by the Board's findings. Gerba v. Public Employees' Retire. Sys. Trustees, supra 83 N.J. at 189, and cases there cited.
When a disabling condition is the result of two or more contributing factors, there are an infinite number of possible variations in the relative significance of the contribution of each of those factors toward the total disability. There is no clear boundary which separates a "disability ... attributable in some degree to the `pathology ...' [but which] nevertheless resulted directly from the traumatic injury" from a disability which resulted when "the traumatic event only ignited or aggravated an underlying osteoarthritic condition without constituting a medically sufficient cause." Kornelia, supra 83 N.J. at 171-172. Where to draw the line along the continuum between causative relations which will be characterized as "direct" and those which will be characterized as less than "direct" for purposes of N.J.S.A. 43:15A-43 is a policy determination which the legislature has delegated in the first instance to the Board. Given its findings that Hilsman's disability is the result of degenerative changes and not of a traumatic tear of cartilage in his knee, we cannot conclude that the Board's decision that Hilsman's disability was not the "direct result" of his fall was an abuse of discretion.

3

"DIRECT RESULT"  QUIGLEY
Quigley suffered the fall to which he attributes his disability on January 17, 1983. The record supports the administrative law judge's finding that until July 16, 1984, his condition was slowly improving. He returned to work in August 1983, although he was able to perform only very limited duties. Medical records indicated that by May 1984 his pain had lessened and he had ceased to walk with the limp which he had acquired following his fall from the truck.
*222 On July 16, 1984, at six o'clock in the morning, he was driving with his wife and children from their home in Elizabeth to New York City for a day's outing at the Museum of Natural History. While he was at a toll booth on the New Jersey Turnpike, his car was hit from the rear by a large truck. The resulting injury exacerbated Quigley's preexisting condition. According to his testimony, "That was the straw that broke the camel's back."
The only medical witness who testified for petitioner was Dr. Walter Pedowitz, an orthopedist who examined and treated him for the first time after the 1984 automobile accident. He expressed the opinion that although the 1983 injury was "a major" contributing cause of Quigley's disability, petitioner's condition was the result of degenerative changes in his joints and those changes were caused by a combination of the 1983 fall, the 1984 automobile accident and, perhaps, an injury in June 1986, when Quigley twisted his back while bending over to pick something up.
The causation issue was vastly complicated by the emotional component of Mr. Quigley's problems. Dr. Alfred Bronner, a psychiatrist, testifying on behalf of the Board, expressed the opinion that Quigley was suffering from alcoholism and a psychogenic pain disorder in addition to orthopedic problems. By psychogenic pain disorder, the doctor meant that the claimant felt pain which was entirely disproportionate to any objective symptoms of a physical condition and that the pain was a symptom of emotional problems. Quigley had an extremely troubled family situation, a first wife, from whom he was divorced, who had been addicted to drugs and had gotten their children involved with drugs, a sister who had twice attempted suicide, an elderly, widowered father with numerous physical problems who was living with the claimant, and a second wife who suffered from depression and anxiety attacks. According to Bronner, this family situation imposed tremendous stresses on Quigley and, together with his injuries and his financial difficulties, contributed to his emotional problems. In Dr. *223 Bronner's opinion, Quigley had unconsciously seized on the psychogenic pain disorder as a morally acceptable way of coping with his other problems. Although the perception of pain was not a pretense, Dr. Bronner, with corroboration by other evidence, testified that Quigley wanted to retain his disability.
Quigley testified that he would leave his house at nine o'clock every evening for the local tavern, remain there until closing time, and consume twelve cans of beer and between ten and twenty shots of whiskey. He conceded that he was an alcoholic but said that he did not want to be cured of that condition because drinking enabled him to bear his pain. But because of a concern that he would become too dependent on drugs, he persisted in refusing to take analgesic medications which were prescribed for him by his physicians. Dr. Bronner testified that Mr. Quigley's ability to work was impaired by his drinking, and that the emotional and physical problems, together, were permanently disabling. Finally, in Dr. Bronner's opinion, the January 17, 1983, accident was a significant contributing factor to Mr. Quigley's emotional problems, but so were the July 1984 automobile accident, and his depression, anxiety, guilt and financial problems.
This evidence amply supports the administrative law judge's recommendation and the Board's conclusion that Quigley was not completely and permanently disabled as a "direct result" of his January 17, 1983, work related accident. In Titman v. Bd. Trustees Teachers' Pens. & An. Fund, 107 N.J. Super. 244, 247 (App.Div. 1969), which was expressly approved in Gerba, supra 83 N.J. at 186, we pointed out that "The word `direct' connotes relative freedom from remoteness, whether in terms of time, intervention of other contributive causes or the like, or a combination of such factors." If the causal relationship between Mr. Quigley's fall in 1983 and his disability subsequent to his 1984 automobile accident is judged by that standard, there was sufficient credible evidence to support the conclusions of the administrative law judge, which were adopted by the Board *224 of Trustees of the Public Employees' Retirement System, that Mr. Quigley's current disability was not the "direct result" of his work related accident. See Gerba, supra, at 189 and the cases there cited.
Both appeals are therefore affirmed.